## HENRY EMERY'S CASE.

The provision of the Declaration of Rights, that no subject shall be compelled to accuse or furnish evidence against himself, exempts the subject from disclosing the circumstances of his offence as well as making confession of guilt; applies to investigations ordered and conducted by the legislature, or either of its branches; is regulated therein by the same rules as in judicial or other inquiries; and is not dispensed with by any statute which fails to secure the subject from future liability, and exposure to be prejudiced, in any criminal proceeding against him, as fully and extensively as he would be secured by availing himself of the constitutional privilege.

The St. of 1871, c. 91, is ineffectual to deprive a witness before the legislative committee on the state police of his constitutional privilege of exemption from being compelled to accuse or furnish evidence against himself, inasmuch as it leaves him liable to criminal prosecution and punishment for any matter to which his testimony may relate.

HABEAS CORPUS, issued May 3, 1871, to John Morrissey, sergeant-at-arms of the general court, upon the petition of Henry Emery, which represented that the respondent was holding him imprisoned in the state house, and that the cause and pretence of the imprisonment were as follows :

That the petitioner was summoned to appear as a witness before a joint special committee of the senate and house of representatives of the general court " to inquire if the state police is guilty of bribery and corruption," and in obedience to the summons appeared before the committee at the state house, when

---

interrogatories were propounded to him which he declined to answer;

That these facts were reported to the senate, and that body ordered the sergeant-at-arms to arrest the petitioner and bring him before the senate to answer for contempt in refusing to answer the interrogatories;

That on May 3, 1871, the sergeant-at-arms arrested the petitioner and brought him to the bar of the senate, whereupon the senate passed an order " that the president propound to Henry Emery, now arraigned at the bar of the senate, the following question : Are you ready and willing to answer before the joint special committee, appointed by this senate and the house of representatives of Massachusetts, to inquire if the state police is guilty of bribery and corruption, the following questions, namely : *First*. Whether, since the appointment of the state constabulary force, you have ever been prosecuted for the sale or keeping for sale of intoxicating liquors ? *Second*. Have you ever paid any money to any state constable, and do you know of any corrupt practice or improper conduct of the state police ? If so, state fully what sums, and to whom, you have thus paid money, and also what you know of such corrupt practice and improper conduct ? "

That the president then and there propounded the questions ordered by the senate to the petitioner, and he answered in writing as follows : " Intending no disrespect to the honorable senate, I answer, under advice of counsel, that I am ready and willing to answer the first question ; but I decline to answer the second question, upon the grounds, *First*, that the answer thereto will accuse me of an indictable offence ; *Second*, that the answer thereto will furnish evidence against me by which I can be convicted of such an offence ; "

That the senate thereupon passed an order that, whereas the petitioner, " in contempt of the authority of this senate, did give an unsatisfactory answer to the second question," he " be committed to the custody of the sergeant-at-arms, to be by him confined in the jail of the county of Suffolk for the space of twenty-five days, or until the further order of the senate unless he shall

sooner signify his willingness to appear and purge himself of his contempt, and testify before the joint special committee and this senate, and satisfactorily answer the questions propounded to him by the joint special committee and this senate," and " the president of the senate is hereby authorized to issue his warrant to commit said Henry Emery to the custody of the sergeant-at-arms, to be imprisoned in the common jail in the county of Suffolk," and " whenever the said Henry Emery, while under the foregoing order, shall inform the sergeant-at-arms that he is willing to testify before the said joint special committee and this senate, it shall be the duty of the sergeant-at-arms immediately to take said Emery before the senate and hold him subject to its order;"

That in conformity with this order the president of the senate on said May 3, 1871, issued his warrant for the arrest of the petitioner; and that it was under said warrant that the sergeant-at-arms was holding the petitioner imprisoned and restrained of liberty. A copy of the warrant was annexed to the petition.

The sergeant-at-arms made return to the writ, on May 4, 1871, at April term of this court in Suffolk, bringing the body of the petitioner into court, and annexing to the return a transcript of the record of the senate, and a duly attested copy of the warrant, un ler the seal of that body and the hand of its president, by virtue of which he was holding the petitioner in his custody; said warrant being the same alleged in the petition, and reciting from the journal of the senate the various orders and proceedings upon which it was founded, substantially as alleged in the petition, save that the written answer returned by the petitioner to the question put to him at the bar of the senate was not therein specifically set forth, and concluding thus:

" These therefore are to require you, the said John Morrissey, sergeant-at-arms, to commit the said Henry Emery to the common jail of the county of Suffolk, to be there imprisoned for the term of twenty-five days, unless he shall be sooner discharged by the senate, in accordance with the terms of the order hereinbefore recited; and the constable of the Commonwealth, his deputies, all sheriffs and their deputies, and all constables and other officers charged with the service or execution of criminal process, are

hereby required to be aiding and assisting you in the execution thereof, and the keeper of said jail is likewise required to receive said Henry Emery, and him safely to keep as aforesaid, for all of which this shall be sufficient warrant."

The transcript of the record of the senate set forth the proceedings before the petitioner was brought to the bar of that body, more fully than they were alleged in the petition, and showed them to be as follows : The joint special committee of the general court on the state police reported to the senate, on April 17, 1871, that in the prosecution of their inquiries they summoned the petitioner to appear before them, and he appeared ; that the usual oath was administered to him, and the same two questions were put to him which were afterwards included in the question put to him at the bar of the senate ; that he " declined and refused to answer either of said questions, on the ground that the answers would criminate himself and tend to furnish evidence against himself, and denied the right of the legislature to require him to testify ; " and that the committee asked the senate to pass an order authorizing and requiring its president " to issue his warrant to the sergeant-at-arms, commanding him to arrest " the petitioner, " wherever he may be found, and have his body at the bar of the senate forthwith to answer as for a contempt in refusing to answer the questions of the joint special committee on the state police." The report of the committee was accepted, and the order which it asked for was passed, and the president of the senate issued his warrant for the arrest of the petitioner in accordance therewith, all on April 17, 1871, the day on which the report was made. The sergeant-at-arms executed this warrant by arresting the petitioner and bringing him to the bar of the senate on May 3, 1871 ; and then and thereafter, on that day, the additional orders were passed by the senate, and other proceedings had, and the additional warrant issued, under which the sergeant-at-arms sought to justify his present holding of the petitioner, and which were fully alleged in the petition.

At the hearing, before *Wells*, J., on May 6, 1871,

*T. H. Sweetser & W. S. Gardner* argued in behalf of the petitioner; and *N. St. J. Green*, (by leave of the court,) for other persons in like interest.

*C. Allen*, Attorney General, for the respondent, contended that the proceedings of the senate, and the warrant upon which the petitioner was held, were justified under the St. of 1871, *c.* 91,* entitled " an act for the better discovery of testimony and the protection of witnesses before the joint special committee on the state police," (which was passed March 8, 1871, and took effect upon its passage,) and argued as follows :

The presumption is always strongly in favor of the constitutionality of a statute. *Commonwealth* v. *People's Savings Bank*, 5 Allen, 428, 431. This statute is the same in substance as the act of congress now in force. See U. S. St. 1862, *c.* 11 ; 12 U. S. Sts. at Large, 333 ; repealing U. S. St. 1857, *c.* 19 ; 11 U. S. Sts. at Large, 155. The rules of common law as administered in courts have little bearing on the present question, because the legislature may change those rules. Parliament is said to be omnipotent. But the legislature of Massachusetts has the same power as parliament, except where restrained by our written constitution. Cooley Const. Limit. 88, 89. *Thorpe* v. *Rutland & Burlington Railroad Co.* 27 Verm. 140, 142. The real question therefore is, whether the clause of the Declaration of Rights, that no subject shall be compelled to accuse or furnish evidence against himself, should have so extensive an application as to restrain the

---

* " No person who is called as a witness before the joint special committee on the state police shall be excused from answering any question or from the production of any paper relating to any corrupt practice or improper conduct of the state police, forming the subject of inquiry by such committee, on the ground that the answer to such question or the production of such paper may criminate or tend to criminate himself, or to disgrace him or otherwise render him infamous, or on the ground of privilege ; but the testimony of any witness examined before said committee upon the subject aforesaid, or any statement made or paper produced by him upon such an examination, shall not be used as evidence against such witness in any civil or criminal proceeding in any court of justice ; provided, however, that no official paper or record produced by such witness on such examination shall be held or taken to be included within the privilege of said evidence so to protect such witness in any civil or criminal proceeding as aforesaid, and that nothing in this act shall be construed to exempt any witness from prosecution and punishment for perjury committed by him in testifying as aforesaid."

legislature from passing a statute like the present, to aid in the investigation of an alleged wide-spread corruption in the administration of the criminal law.

When the Constitution was adopted, a witness in court was excused from giving answers criminating himself, by the rules of common law ; but a witness before parliament, or a committee of parliament, had no such protection. The rules of common law and of parliamentary law were directly opposed to each other. Cush. Parl. Law, §§ 983, 1001. The provision of the Declaration of Rights was designed simply to embody the common law rule, and not to affect the parliamentary law. This is apparent from the history of the rule of common law. The chief feature of the inquisitorial system of investigating crimes, which has been practised where the common law has not prevailed, is the compulsory examination of suspected persons. Actual physical torture, as a method of forcing confessions, has now mostly ceased. But the same principle remains in a mitigated form. The method of the common law has been wholly different ; the judge is not the prosecutor, and the supposed criminal is not required to be the witness. The constitutional provision had reference to these two methods of prosecuting crimes. It meant to say, there must be an accuser, and there must be proof, and a man shall not be compelled to be a witness against himself in criminal prosecutions, or as one step in the judicial investigation of crime. Widely different from this, however, is a legislative investigation of a great public evil. Such an investigation is not for the purpose of punishing any specific crime, but of purifying the public service. There can be no greater evil than a habit of corruption in the administration of the criminal law. If the legislature find need to investigate a charge of such corruption, there is reason for dispensing with the rules applicable to ordinary prosecutions for crimes. The constitutional provision had no reference to such a rare and extraordinary occasion. This is shown by various considerations. All the other provisions of this article in the Declaration of Rights relate only to ordinary prosecutions. The marginal clause is simply, " Prosecutions regulated." No speech, debate, letter or conversation of any of the framers of the Constitution

is known, which shows an intention to change the existing rule of parliamentary law. That rule, requiring witnesses to testify before parliament even though it might criminate them, had existed in England side by side with the rule of the common law. It may well stand here, side by side with the constitutional provision, which had reference only to prosecutions in the courts of law. See *People* v. *Kelly*, 24 N. Y. 74, 81–83 ; 1 Greenl. Ev. (12th ed.) § 451 *a*.

The case was held under advisement, and for conference with the other justices, until May 22, 1871, when the following opinion was read therein :

WELLS, J. The petitioner represents that he is imprisoned and restrained of his liberty, at the state house in Boston, by John Morrissey, sergeant-at-arms of the general court of Massachusetts. Upon return made to the writ, and a hearing of the parties before the court, it appears that the petitioner is held by the respondent under a warrant of commitment, in due form of law, issued by order of the senate, under the hand of the president thereof, requiring the respondent, as sergeant-at-arms of that body, " to commit the said Henry Emery to the common jail of the county of Suffolk, to be there imprisoned for the term of twenty-five days, unless he shall be sooner discharged by the senate, in accordance with the terms of the order " recited in said warrant.

It appears further, from the order recited, that the said Emery, having been summoned to give testimony before a joint special committee of the senate and house of representatives, charged with an investigation affecting the public interests and with authority to require his testimony, and having refused to testify, was arrested and brought to the bar of the senate, pursuant to an order of that body, to answer as for a contempt in so refusing. Being arraigned, the following question was propounded to him : " Are you ready and willing to answer before the joint special committee appointed by this senate and the house of representatives of Massachusetts, to inquire if the state police is guilty of bribery and corruption, the following questions, namely : *First.* Whether, since the appointment of the state constabulary force,

you have ever been prosecuted for the sale or keeping for sale of intoxicating liquors ? *Second.* Have you ever paid any money to any state constable, and do you know of any corrupt practice or improper conduct of the state police ? If so, state fully what sums, and to whom, you have thus paid money, and also what you know of such corrupt practice and improper conduct.". The cause of commitment, as stated in the order therefor, and as recited in the warrant, is that " the said Emery, in contempt of the authority of this senate, did give an unsatisfactory answer to the second question propounded."

The record of the senate, accompanying the return, sets forth the answer made by said Emery to the questions propounded to him before the senate, and his reason for refusing to answer the second question, as follows : " Intending no disrespect to the honorable senate, I answer, under advice of counsel, that I am ready and willing to answer the first question ; but I decline to answer the second question, upon the grounds, *First*, that the answer thereto will accuse me of an indictable offence ; *Second*, that the answer thereto will furnish evidence against me, by which I can be convicted of such an offence." It is not contended that this answer was made otherwise than in good faith ; nor is it claimed that it was held to be unsatisfactory by the senate for the reason that it was evasive, or that the privilege was set up as a pretext merely. It is apparent that an affirmative answer, to the question put to him, might tend to show that he had been guilty of an offence, either against the laws relating to the keeping and sale of intoxicating liquors, or under the statute for punishing one who shall corruptly attempt to influence an executive officer by the gift or offer of a bribe. Gen. Sts. *c.* 163, § 7.

The principal questions raised and submitted are : *First.* Whether the constitutional privilege of exemption, relied on, is applicable to investigations ordered and conducted by the legislature or either of its branches. *Second.* Whether, in this case, the petitioner is deprived of the privilege by force of the act " for the better discovery of testimony and the protection of witnesses before the joint special committee on the state police," passed on the eighth day of March 1871. These questions having been

fully and learnedly argued by counsel upon both sides, it was deemed proper and desirable that the decision and opinion to be given thereon should receive the consideration and sanction of the other members of the court, upon advisement and conference. That conference having been had, the decision and opinion now to be announced bears the approval and unanimous concurrence of all the members of the court.

That any person, held in custody by order of either branch of the legislature, is entitled to have the cause of his imprisonment examined by the supreme judicial court, upon *habeas corpus*, is fully settled by the case of *Burnham* v. *Morrissey*, 14 Gray, 226. The right of either branch to inquire into an alleged disrespect or contempt of its authority, and to compel the attendance of the party charged therewith, to answer to the charge and await its judgment thereon, is exclusive, and will not be interfered with. How far the judgment of that body is conclusive upon the question whether the facts alleged and proved constitute an offence punishable as a contempt, in a case where the proceedings are correct in form, and no constitutional privilege of the citizen appears to have been infringed ; and how far, and under what conditions, it is open to revision by the court upon *habeas corpus;* it is not necessary, for the purposes of this case, to consider. The petitioner relies solely upon the privilege of exemption from answering the inquiry put to him, which he claims, under the twelfth article of the Declaration of Rights of the inhabitants of the Commonwealth of Massachusetts. If that is applicable to his case, it is his shield, and he is entitled to be discharged ; otherwise, not.

The provision is this : " No subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him ; or be compelled to accuse, or furnish evidence against himself." The whole article has such reference to proceedings for the punishment of criminal offences as to justify the designation in the margin by the two words " Prosecutions regulated." But in that relation, the sentence above quoted from the article plainly presents three distinct aspects. The first branch of the sentence defines the conditions

upon which alone the subject can be put upon his trial for any offence. The second forbids that he should be compelled to accuse himself. By the narrowest construction, this prohibition extends to all investigations of an inquisitorial nature, instituted for the purpose of discovering crime, or the perpetrators of crime, by putting suspected parties upon their examination in respect thereto, in any manner; although not in the course of any pending prosecution.

But it is not even thus limited. The principle applies equally to any compulsory disclosure of his guilt by the offender himself, whether sought directly as the object of the inquiry, or indirectly and incidentally for the purpose of establishing facts involved in an issue between other parties. If the disclosure thus made would be capable of being used against himself as a confession of crime, or an admission of facts tending to prove the commission of an offence by himself, in any prosecution then pending, or that might be brought against him therefor, such disclosure would be an accusation of himself, within the meaning of the constitutional provision. In the absence of regulation by statute, the protection against such self-accusation is secured by according to the guilty person, when called upon to answer as witness or otherwise, the privilege of then avowing the liability and claiming the exemption; instead of compelling him to answer and then excluding his admissions so obtained, when afterwards offered in evidence against him.

This branch of the constitutional exemption corresponds with the common law maxim, *nemo tenetur seipsum accusare*, the interpretation and application of which has always been in accordance with what has been just stated. Broom Max. (5th ed.) 968. Wingate Max. 486. Rosc. Crim. Ev. (2d Am. ed.) 159. Stark. Ev. (8th Am. ed.) 41, 204, and notes. 1 Greenl. Ev. § 451, and notes.

A like interpretation has been given to a provision in the Constitution of the state of New York, which in terms is more restricted than the one under consideration; to wit, that no person shall " be compelled, in any criminal case, to be a witness against himself." N. Y. Const. of 1846, art. 1, § 6. In the case of

*People* v. *Kelly*, 24 N. Y. 74, it was held that this clause pro-
tected a witness from being compelled to answer to matters that
might tend to criminate himself, when called to testify against
another party.    And in *People* v. *Mather*, 4 Wend. 229, this
exemption was declared to extend to the disclosure of any fact
which might constitute an essential link in a chain of evidence by
which guilt might be established, although that fact alone would
not indicate any crime.

The third branch of the provision in the Constitution of Massa-
chusetts, " or furnish evidence against himself," must be equally
extensive in its application; and, in its interpretation, may be
presumed to be intended to add something to the significance of
that which precedes.    Aside from this consideration, and upon
the language of the proposition standing by itself, it is a reason-
able construction to hold that it protects a person from being
compelled to disclose the circumstances of his offence, the sources
from which, or the means by which · evidence of its commission,
or of his connection with it, may be obtained, or made effectual
for his conviction, without using his answers as direct admissions
against him.    For all practical purposes, such disclosures would
have the effect to furnish evidence against the party making
them.    They might furnish the only means of discovering the
names of those who could give evidence concerning the transac-
tion, the instrument by which a crime was perpetrated, or even
the *corpus delicti* itself.

Both the reason upon which the rule is founded, and the terms
in which it is expressed, forbid that it should be limited to con-
fessions of guilt, or statements which may be proved, in subse-
quent prosecutions, as admissions of facts sought to be established
therein.    The question then comes, Do these provisions apply to
investigations before a legislative body?

No one will contend, of course, that the legislature is not lim-
ited in its powers by the provisions of the Constitution, equally
with all other departments of the government and the whole
body of the Commonwealth, whether undertaken to be exercised
in the ordinary form of laws enacted, or by those orders and re-
quirements which are incidental to its functions and are adopted

as means of their performance. There is nothing in the terms of the article in question, to except legislative bodies from its operation. The nature and purpose of the provisions are equally applicable to investigations conducted by the legislature itself, or by one of its branches, or by a committee of its own members, as when conducted before the courts, or by commissioners, or other tribunals established by law. Such tribunals can in no case disregard this rule of protection. The legislature cannot, by the most formal and solemn enactments of law, authorize them to do it. If then the legislature cannot, by the formal enactment of all its branches, subject a citizen to such compulsory disclosure, it is difficult to see on what ground of argument or inference, from necessity, propriety, or the nature of constitutional republican government, an authority can be deduced for either branch of the legislature to do so by its mere order.

The protection of the subject is not secured by the Constitution, if it may be so invaded. The range of investigation, which is open to inquiry by the legislature, is unlimited. It is the general court of the Commonwealth ; entitled to inquire into the condition and efficiency and mode of operation of all administrative departments of the government of the state, the proper execution of the laws, and all that concerns the public welfare. If other means of discovering offences and convicting offenders are thought to be inefficient or unsatisfactory, investigations by direct authority of the legislature, prompted by public complaints, and intended primarily to furnish information upon which that body may act in remedying abuses in the administration of public affairs, may easily be perverted into an effective means of procuring material to aid in the institution and maintenance of criminal prosecutions. Committees of the legislature, or commissioners acting under its order, to inquire into any supposed failure to enforce the laws, if freed from the restrictions of the Constitution in this particular, may be found useful and efficient as auxiliaries of the grand juries of the Commonwealth. In this way, parties exposed to prosecutions would find their constitutional protection to have failed them. It is the capability of abuse, and not the probability of it, which is to be regarded in judging of the rea-

sons which lie at the foundation, and guide in the interpretation, of such constitutional restrictions.

It is argued by the attorney general, that the article in question is merely the adoption of a rule which prevailed at the common law; that, along with that rule, there always existed in the parliament of England a practice to disregard it in investigations pertaining to the business of that body; and that the rule of legislative investigation remains, unaffected by the constitutional article.

But the rule of the common law did not control parliamentary inquiries, for the simple and obvious reason that the authority of parliament was more potent than the common law, and might change, annul or suspend its restrictions, as that body should determine. The exception is not confined to investigations relating to the business of parliament, but extends to all those in which it authorizes a disregard of the common law rule, before whatever tribunal they are authorized to be conducted. It is because the Constitution of Massachusetts is more potent and above, not only the common law, but the legislature also; controlling all tribunals and all departments of the government alike, as well as all inhabitants of the Commonwealth; that this safeguard of individual rights cannot be suspended or invaded, either by general laws, or the special order of the legislative body, or of any of its branches.

It is to be observed that the provision relates to the privileges of the subject, and not to the authority of any tribunal or body before which inquisition may be made. It places a limit upon all inquiry to which he may be subjected, not by defining the extent of the authority by which it is made, but by surrounding him with a privilege of exemption, which cannot be set aside by any authority without his own consent. It excludes the legislature as well as the courts. It follows, also, that in its exercise it is regulated by the same rules in legislative investigations, as in judicial or other inquiries.

The remaining question arises upon the effect of the statute of March 8, 1871.

It follows from the considerations already named, that, so far as this statute requires a witness, who may be called, to answer questions and produce papers which may tend to criminate himself, and attempts to take from him the constitutional privilege in respect thereto, it must be entirely ineffectual for that purpose, unless it also relieves him from all liabilities, for protection against which the privilege is secured to him by the Constitution. The statute does undertake to secure him against certain of those liabilities, to wit, the use of any disclosures he may make, as admissions or direct evidence against him, in any civil or criminal proceeding.

In a case already referred to, *People* v. *Kelly*, 24 N. Y. 74, it was held that such a provision, by statute, removed all the liability against which the witness was secured by the constitutional exemption, and that, being thus otherwise furnished with all the protection to which the Constitution entitled him, he had no further occasion, and therefore no right, to set up the claim of privilege, as a protection against that to which he was not exposed. But this decision was made upon the ground that the terms of the provision relied on, in the Constitution of New York, protected the witness only from being compelled " to be a witness against himself," and did not protect him from the indirect and incidental consequences of a disclosure which he might be called upon to make.

The terms of the provision in the Constitution of Massachusetts require a much broader interpretation, as has already been indicated; and no one can be required to forego an appeal to its protection, unless first secured from future liability, and exposure to be prejudiced, in any criminal proceeding against him, as fully and extensively as he would be secured by availing himself of the privilege accorded by the Constitution. Under the interpretation already given, this cannot be accomplished so long as he remains liable to prosecution criminally for any matters or causes in respect of which he shall be examined, or to which his testimony shall relate. It is not done, in direct terms, by the statute in question; it is not contended that the statute is capable of an interpretation which will give it that effect; and it is clear that

Emery's case.

It cannot, and was not intended so to operate. Failing, then, to furnish to the persons to be examined an exemption equivalent to that contained in the Constitution; or to remove the whole liability against which its provisions were intended to protect them it fails to deprive them of the right to appeal to the privilege therein secured to them.

The result is, that, in appealing to his privilege, as an exemption from the obligation to answer the inquiries put to him, the petitioner was in the exercise of his constitutional right; and his refusal to answer upon that ground was not, and could not be considered as disorderly conduct, or a contempt of the authority of the body before which he was called to answer. There being no legal ground to authorize the commitment upon which he is held, he must be discharged therefrom. He is

*Discharged accordingly.**

---

* Pending the consideration of the main question, between the time of the return of the writ and the discharge of the petitioner, he was admitted to bail, and on May 4, 1871, his recognizance taken, with Daniel Chamberlain as surety, in the sum of $5000, conditioned that he should "personally appear before the justices of the supreme judicial court, to be holden at Boston, within and for the county of Suffolk, on Saturday, the 6th day of May 1871, then and there to answer to such matters and things as shall be objected against him on the behalf of said Commonwealth, and shall do and receive that which by the said court shall be then and there enjoined upon him, and not depart without license." On May 22, 1871, before reading the foregoing opinion, Mr. Justice Wells read the following as his own opinion respecting the admission of the petitioner to bail:

· "The case of Henry Emery, petitioner for writ of *habeas corpus*, was heard about two weeks since. At that time it appeared that the investigation before the legislative committee, for which the testimony of the petitioner had been required, was already closed, so that the proceedings were important only for the proper vindication of the lawful authority of the senate. The postponement was therefore ordered for the purpose of further consideration, and a conference with the whole court; the petitioner meanwhile remaining under bail for his appearance from day to day, until judgment should be given in the case.

"I may premise that bail was allowed to be given without any regard to the question whether the petitioner was entitled to be released finally upon the writ.

"Admitting a prisoner to bail, as the result of the hearing, and in pursuance of the final judgment in the case, is a proceeding of another and entirely independent character. It is to such allowance of bail only that the provisions of the Gen. Sts. c. 144, § 31, (Rev. Sts. c. 111, § 35,) relate. This is rendered more apparent by referring to the earlier provision in the St. of 1784, c. 72, § 2. Admitting to bail, by means of the writ of *habeas corpus*, in pursuance of these provisions, necessarily implies a legal cause of imprisonment, and a legal warrant or order therefor, from a competent authority, acting within its jurisdiction. Unless these exist, this court cannot hold the party to bail, but must discharge him.

"In the present case, if the petitioner has shown no ground for an absolute discharge, 'law and justice' do not require nor permit that he should be admitted to bail. Such a proceeding would be inappropriate as well as unauthorized. In that event he must be remanded; and as the order of commitment is for a definite period within the constitutional authority of the senate, (Const. of Mass. part 2, c. 1, § 3, art. 11,) his imprisonment for that period will take effect and be measured from the time he is so remanded, although the legislature may have closed its session in the interval.

"Pending the proceedings before the court, upon *habeas corpus*, the custody of the petitioner is, in all cases, and under all circumstances, entirely at the discretion of the court before which the writ is returned. Bail for his appearance from day to day is simply a means by which this custody is maintained. This unrestricted control is necessary to the efficiency and completeness of the remedy, which, by the Constitution, part 2, c. 6, art. 7, is secured to be enjoyed 'in the most free, easy, cheap, expeditious and ample manner.' It is provided in the most explicit terms by the Gen. Sts. c. 144, § 24: 'Until judgment is given, the court or judge may remand the party, or may bail him to appear from day to day, or may commit him to the sheriff of the county, or place him under such other care and custody as the circumstances of the case may require.'

"It is this special authority, and not the general power to admit to bail, that has thus far been exercised in this case."