## UNITED STATES v. JAMES et al.

### (District Court, N. D. Illinois. February 26, 1894.)

CONSTITUTIONAL LAW—INTERSTATE COMMERCE ACT—COMPELLING SELF-INCRIMINATION.

Act Feb. 11, 1893, which declares that no person shall be excused from testifying or producing documents in proceedings based upon the interstate commerce act on the ground that it may tend to criminate him, but that he shall not be prosecuted or punished on account of any matter concerning which he may testify, violates the fourth and fifth amendments to the United States constitution, which declare that the right of the people to be secure against unreasonable searches and seizures shall not be violated, and that no person shall be compelled in any criminal case to be a witness against himself.

Rule to punish James G. James and Gordon McLeod for contempt of court in refusing to answer questions asked by the grand jury. Rule discharged.

T. E. Milchrist, U. S. Dist. Atty.
J. N. Jewett and Aldace F. Walker, for defendants.

GROSSCUP, District Judge. The grand jurors report to the court that, on the 16th day of February instant, they were duly engaged in inquiring into certain alleged violations, in this district and division, of the interstate commerce act by the Lake Shore & Michigan Southern Railway Company, and other railroads and common carriers, and

[1] 7 C. C. A. 122.

that James G. James, being before them in response to a subpoena as a witness, and being inquired of respecting his knowledge of the shipment of certain products from Chicago east at a less freight rate than was named in the open tariffs then in force, declined to answer the question, for the reason that an answer thereto would tend to criminate himself personally, or would disclose a source of evidence which would tend to criminate him personally, under the provisions of the interstate commerce act. Certain other questions of a like tenor were propounded, and the answers refused by the witness substantially for the same reasons. On the same day Gordon McLeod appeared before the grand jurors as a witness, and, after answering that he was the general manager of the Merchants' Dispatch Transportation Company at Chicago, was asked if, in response to a subpoena to that end, he was ready to produce certain reports, or copies thereof, made to the Central Traffic Association, the Trunk Lines Association, or any person connected therewith, by the Lake Shore & Michigan Southern Railway Company, the Merchants' Dispatch Transportation Company, or any person connected therewith, relating to the shipments of property from Chicago to points outside of the state of Illinois in September, 1892, and certain other documents of the same character. To which he responded that he was not, and, upon being inquired of why not, he refused to answer the question, for the reason that the answer might tend to criminate him, or lead to disclosures that would criminate him.

This report brings to the court the question whether the act of February 11, 1893, is violative of the letter or spirit of the fourth and fifth amendments to the constitution of the United States. The fourth amendment provides "that the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated;" and the fifth amendment declares "that no person shall be compelled in any criminal case to be a witness against himself." The act of February 11, 1893, in effect provides that no person shall be excused from testifying or producing books, papers, tariffs, contracts, agreements, and documents in any case or proceeding, criminal or otherwise, based upon the interstate commerce act, on the ground that the same may tend to criminate him, or subject him to a penalty or forfeiture, but that any person so testifying shall not be prosecuted, or subjected to any penalty or forfeiture, on account of any transaction, matter, or thing concerning which he may testify, or produce the documentary or other evidence.

Every man's life is, so far as society is interested, a series of personal acts. Each act, not impinging unlawfully upon the rights of others, or falling within the definitions of the criminal statutes, is a personal right of the individual. The criminal code is a series of definitions which, for the purposes of public safety or welfare, designate certain of these personal acts, either isolated, or in connection with other acts or intentions, as crimes against the commonwealth. The identification of the acts with the definitions of the criminal code is dependent upon such knowledge as can be ob-

tained, either from the observation of others, or the disclosures of the person himself. The methods of such identification have been formulated into what may be called the science of evidence. These personal acts, however, like the events of natural law, are interlinked with others, and are each a part only of a connected and cohering series of acts. The student of nature uncovers her unknown events by seizing upon a known event, and, with the knowledge and suggestions thus acquired, proceeds according to the laws of known connection to others. Thus, an event remote from the one that is the ultimate object of the inquiry becomes the clue or break from which the process of unraveling begins. Judicial tribunals, in search of personal acts that fall within the criminal code, are served by a like law of connection and cohesiveness. A known act in a person's life is made the beginning of the tribunal's work of unraveling, and, though apparently remote from the actual criminal deed, is so linked therewith that the judicial following out of the intervening thread will eventually bring out the full disclosure of the criminal act. The disclosure of such a remote act is therefore indirectly, but effectually, a disclosure of the criminal act itself. Since the Counselman Case, 142 U. S. 547, 12 Sup. Ct. 195, it is admitted law that every person is protected by the fifth amendment against self-disclosure in any proceeding, civil or criminal, of such of his own acts as would subject either the act, or any connected act, to the dangers of incrimination. The theory of our criminal proceeding, like that of Great Britain, is accusatory and not inquisitorial. No person can be subjected to the penalties of the law unless every fact essential to the identification of the act charged with the crime is apparent from sources other than himself, or his own voluntary disclosures. The accused can stand, as against the menace of the law's penalties, upon the sanctity of his own personal knowledge, and the constitutional guaranty puts a seal upon that knowledge that no legislative or judicial hand can break. Of course, this immunity or personal right can only protect against the danger that was in contemplation of the constitution, and cannot, therefore, be diverted, as mere pretexts, to uses beyond that point. To avoid its misuse upon such pretexts, and at the same time secure to the person's knowledge the sanctity that is intended, it devolves upon the court, in each instance, to determine, from all the circumstances of the situation, when the question arises, whether the disclosure sought for carries any real menace of self-incrimination.

But, while the Counselman Case establishes this guaranty to the extent thus pointed out, it leaves undecided the most interesting and important question connected with the subject. In the case under investigation now it is claimed that the act of February 11, 1893, affords all the immunity that the fifth- amendment was intended to provide. If the guaranty of the fifth amendment be simply against a compulsory self-invoking of the penalties and forfeitures of the law, as distinguished from the other consequences of self-accusation, the claim is, in my opinion, well founded. The act of Feb-

ruary 11, 1893, is a broad prohibition against the prosecution of a person for any act to which the disclosure relates. It unquestionably refers to a criminal procedure like this, and the immunity stated in the latter clause of the act relates, undoubtedly, not simply to the causes or proceedings before the interstate commerce commission, but to any cause or proceeding, criminal or otherwise.

It is urged with much emphasis that congress cannot compel, even upon conditions of pardon, that which the constitution forbids, —that the constitution cannot be amended by a simple legislative act. The proposition in the abstract is true. If the fifth amendment is intended to grant to the person complete immunity against all the consequences of self-accusation of crime, irrespective of the nature of such consequences, no legislative act can cut down or diminish such immunity. The prohibition against prosecution would, in that case, not be coextensive with the right or immunity accorded by the constitution. But, if the fifth amendment be simply a guaranty against the law-inflicted pains and penalties that might follow compulsory self-accusation, it is clear that the abrogation of such pains or penalties, so far as they are applicable to the person interested, is a complete fulfillment of the constitutional guaranty. If the amendment were made for that purpose only, it is only prohibitory of legislation that might interfere with that purpose. If that purpose be effectually recognized and protected in the legislative act, it cannot be said that such act either repeals or violates the constitution. Every person is subject, in respect of his duty to give testimony, to the legislation of congress, except as the power of congress in that respect is curtailed by the constitution. The act is operative upon the individual, if it preserves inviolate his constitutional immunity; and, if that immunity is against the law-inflicted penalties and forfeitures of crime only, the abrogation of such penalties and forfeitures prevents the legislative act and the immunity from coming in conflict. The argument, in so far as it admits that the amendment grants an immunity against the law-inflicted pains and penalties of self-accusation only, and still insists that it is a repeal of the constitution, is fallacious, because it assumes that the language of the amendment is broader than its admitted purpose. The argument introduces a confusion of terms, by giving to the language of the amendment one meaning, and to its real intention a narrower one. Harmonize the language of the amendment and its supposed real purpose in one term,—as, for instance, "No person shall suffer the law-inflicted pains and penalties of a conviction, to the bringing about of which his involuntary self-accusation has contributed,"—and the act of February 11, 1893, is at once seen to be no impingement upon the fifth amendment.

The question, then, comes back to this: What was the real purpose of the framers of the fifth amendment? Did they intend to guaranty immunity thereby against compulsory self-accusation of crime, so far as it might bring to the witness law-inflicted pains and penalties only? Or, was it the purpose to make the secrets

of memory, so far as they brought one's former acts within the *definitions of crime*, inviolate as against judicial probe or disclosure?

The Counselman Case leaves this question undecided. Some of the dicta of the opinion seem to show that the court purposely left it undecided. As, for instance, the opinion states: "It is quite clear that legislation cannot abridge a constitutional privilege, and that it cannot replace or supply one; at least, unless it is so broad as to have the same extent in scope and effect." So far, therefore, as the supreme court of the United States is concerned, I regard the question as an open one.

There is a long line of decisions in the several state courts upon provisions of the state constitutions identical with, or analogous to, the fifth amendment of the federal constitution. None of these decisions, so far as I am advised, except Respublica v. Gibbs, 3 Yeates, 429, an early Pennsylvania case, held that the immunity was against any consequence of compulsory self-accusation other than the penalties and forfeitures inflicted by the law. No decision of any state has been called to my attention in which the constitutional provision was construed in the light of a statute granting complete immunity against prosecution. There are many states, however, in which the courts of last resort have held that similar constitutional provisions are not violated by the compulsory self-accusation of a witness, where a statute exists making it unlawful to use his disclosures in any future prosecution. It is interesting to note, however, that all of these cases related to offenses, the wisdom of which were then somewhat debated questions, and the prosecution of which was, to some extent, the triumph or defeat of the prevailing popular opinion. Thus, in Arkansas and Georgia, (State v. Quarles, 13 Ark. 307, and Higdon v. Heard, 14 Ga. 255,) the prosecution was under the gaming laws; in Indiana, (Wilkins v. Malone, 14 Ind. 153,) under the usury laws; in New York, (People v. Kelly, 24 N. Y. 74,) on an inquiry relating to bribery at an election; in New Hampshire, (State v. Nowell, 58 N. H. 314,) under the liquor laws; and in still another New York case, (People v. Sharp, 107 N. Y. 427, 14 N. E. 319,) in a prosecution for bribery of aldermen. Some of these cases naturally aroused the indignation of the community in which the court sat. All of them were cases, doubtless, where the immunity claimed by the witness aroused no just sympathy. They each presented a situation where the fifth amendment, if construed broadly, seemed to offer an obstacle to a just administration of the criminal law. All of these cases are, however, expressly overruled in the Counselman Case. There are other cases,—especially the Emery Case, 107 Mass. 172, and Cullen v. Com, 24 Grat. 624,—in which the supreme courts of the state where they arose held that the immunity granted by the constitutional provision was not simply against the use of the self-accusatory evidence in subsequent prosecutions; and the statutes to that effect did not, therefore, fully meet the constitutional requirement. These were the chief predecessors of the Counselman Case, and *to that extent* met with the approval of the supreme court of the United States.

It is unquestionable that all of these cases, either in the matter decided, or in the dicta of the opinion, commit the respective courts deciding them to the doctrine, that a statute which in effect forecloses any prosecution on account of anything disclosed in the testimony meets fully the purpose of the constitutional provision. But the nature of these cases, and the fact that all but two of them have been partially disapproved by the supreme court, must be borne in mind.

The case at bar, like those cited, inspires no wish in the court to protect the witnesses. The interstate commerce act is a law of the land, and the witnesses ask for the protection of the amendment under circumstances which indicate that, having violated it before, they have no intention to cease violating it now. It is the contest of people who disbelieve in the expediency of the law against the attempt to enforce it. The protection is asked, not so much to keep inviolate the secrets of the human breast, as to have immunity in further violating a law of the land. Judged by this specific instance, the fifth amendment, if construed broadly enough to afford the witnesses immunity against testifying, is an obstruction in the path of the administration of law. But the fifth amendment must not be judged by a single specific instance. It was placed in the organic law of the land for a purpose, and that purpose, when ascertained, must be enforced, howsoever it may affect sporadic cases, or even the great body of cases, that may come before the court.

What, then, was the intention of the makers of the fifth amendment? This can only be ascertained by transferring ourselves as nearly as possible to the time in which they lived, and to the influences and conceptions that were then in vogue. From the earliest times the governmental systems of the Anglo-Saxon and the Latin races have been widely different. Among Latin peoples the chief thought has been for their welfare and advancement as a collective entity. Thus was depressed into comparative obscurity the rights or happiness of the individual. Among Anglo-Saxons, on the contrary, the individual always remained the most prominent purpose in governmental conception. The man never became blended in the mass, and his rights and personal happiness were not lost sight of in the movements of the time. Thus it was that, while in Latin countries men could be lawfully carried off, their homes and property confiscated, their private papers given up to the public, and their memories searched by all the processes of menace and torture; in the British Islands the home was a castle into which the sovereign could not enter, the individual could not be compelled to respond to accusation, except upon indictment by his peers, and his private papers and memory were inviolate against search. The progress of the English-speaking people to the highest form of civil and religious liberty is not adventitious or accidental, but is due to this ennoblement of the individual in the conceptions and practices of the English law.

The same criminal procedure could not grow from such different soil.

In the one, the national entity—only another name for the ruling power—would brook no obstacle that blocked its way. Influenced by passion, revenge, fanaticism, and the myriad of civil and religious whims, it erected inquisitions and torture stalls, and sought thereby to explore the depths of the human breast, as it had already power to search the closets of human habitations. In the other, the individual lived for himself and family, and, except within certain governmental relations, was in no sense legally interwoven with the rest of mankind. Government was for him; not he for the government. He could lock his door against the messenger of the crown, and his breast against any search that would bring him within the crown's displeasure.

In the one, grew up a criminal procedure that was almost purely inquisitorial, and whose history now appalls the enlightened conscience; in the other, grew up a system purely accusatory, where the offending individual could lawfully stand in silence, and demand proof from sources other than himself. In the one, the power of the sovereign pervaded every nook and corner of the individual; in the other, the power of the sovereign came only to the outward person of the subject, and there stopped. This jealousy against any touch, until the right of individual liberty was shown forfeited, proved the corner stone of popular liberty.

But English public opinion, upon subjects both civil and religious, was in a constant state of change and ferment. The accepted views of to-day became the heresies and treasons of to-morrow. The view in power is always the right view, and is wishing for the means to enforce itself universally. It is no wonder, therefore, that sparks of the continental system landed on the English islands, and found spots where the fuel was ready for ignition. Early the ecclesiastical bodies, by the oath of ex officio, attempted, under penalties of excommunication, to extort confessions of heresy and sin from communicants. Later, the star chamber and high commission put for a time in practice the same methods of compulsory self-disclosure of offenses against the state. However, the general English jealousy of personal sanctity resisted, and numerous statutes were passed guarantying the right of silence against the accusation of both the church and the crown. But, in the generation of Englishmen and English colonists in America who lived to see our Constitution adopted, and whose counsels were unquestionably embodied therein, there sprang up in England a formidable revival of prosecutions for the so-called seditious offenses. A paper, a speech, talk among friends, an understanding or confederacy to right some particular wrong, was made the basis of prosecuting the participants, if the sentiments therein prevailing could be distorted into any seeming hatred or contempt of the crown, the peers, the commons, or any of the national functionaries. Some of the men who were tried possibly deserved their punishment, but the illimitable opportunities thereby opened up to outlaw every species of sentiment and progression that did not meet the views of the prevailing government shocked the Anglo-Saxon intelligence. The most stirring state trials of history occurred, in which the government was on the one side

and the almost universal intelligence and conscience on the other. These trials, and their possible consequences on the fate of personal liberty, were not history simply, to the framers of the fifth amendment. Those men had lived through these trials, and taken on their coloring and excitement. They themselves, in their early plannings against the trespasses of the English crown, had been exposed to the danger of like prosecution and punishment. In the shadow of such a menace, progress and personal safety must separate, unless the right of unbroken silence were among the immutable personal privileges. Nearly all of the ten amendments to the constitution breathe this apprehension, and erect against it the barriers of organic law. This is forcibly shown by the fact that the amendments were insisted upon by the states most jealous of the central general government, and most apprehensive that such a government might become the oppressor of their personal rights.

The privilege which the framers of the amendment secured was silence against the accusation of the federal government,—silence against the right of the federal government to seek out data for an accusation. This privilege of silence was, as they believed, and as events then looked, in the interest of progress and personal happiness, as against the narrow views of adventitious power. Did they originate such privilege simply to safeguard themselves against the law-inflicted penalties and forfeitures? Did they take no thought of the pains of practical outlawry? The stated penalties and forfeitures of the law might be set aside; but was there no pain in disfavor and odium among neighbors, in excommunication from church or societies that might be governed by the prevailing views, in the private liabilities that the law might authorize, or in the unfathomable disgrace, not susceptible of formulation in language, which a known violation of law brings upon the offender? Then, too, if the immunity was only against the law-inflicted pains and penalties, the government could probe the secrets of every conversation, or society, by extending compulsory pardon to one of its participants, and thus turn him into an involuntary informer. Did the framers contemplate that this privilege of silence was exchangeable always, at the will of the government, for a remission of the participant's own penalties, upon a condition of disclosure, that would bring those to whom he had plighted his faith and loyalty within the grasp of the prosecutor? I cannot think so.

Happily, the day when this immunity is needed seems to be over. It is difficult for us, who live in a time when there are few, if any, definitions of crime that do not meet with the approval of universal intelligence and conscience, to appreciate these conceptions of our fathers. The battle for personal liberty seems to have been attained, but, in the absence of the din and clash, we cannot comprehend the meaning of all the safeguards employed. When we see the shield held before the briber, the liquor seller, the usury taker, the duelist, and the other violators of accepted law, we are moved to break or cast it aside, unmindful of the splendid purpose that first threw it forward. But, whatever its disadvan-

tages now, it is a fixed privilege, until taken down by the same power that extended it. It is not certain, either, that it may not yet serve some useful purpose. The oppression of crowns and principalities is unquestionably over, but the more frightful oppression of selfish, ruthless, and merciless majorities may yet constitute one of the chapters of future history. In my opinion, the privilege of silence, against a criminal accusation, guarantied by the fifth amendment, was meant to extend to all the consequences of disclosure.

The effectiveness of the statute of February 11, 1893, might well be questioned on another ground. It is a statute of pardon. Until the witness makes his disclosure he is chargeable with the offense within his personal knowledge. The pardon becomes effective only at the moment and upon condition of disclosure. But pardon is not necessarily unilateral. No person is compelled to accept the legislative or executive grace. Chief Justice Marshall, speaking for the supreme court, so held in Wilson's Case, 7 Pet. 150, where a pardon was granted by the president for a capital offense. In the case at bar, it must be assumed that the witness is guilty of some offense. In the absence of the statute of February 11, 1893, he has the undoubted constitutional right of silence. It is said that that right is taken away by the immunity or pardon extended by the statute. But he chooses not to accept such immunity or pardon. His refusal to answer the question is such refusal of acceptance. He prefers to stand upon his constitutional right and take his chances of conviction, rather than expose himself to the civil liabilities and the odium of self-confessed crime. It may be that the offense is of an ancient date, and has been succeeded by years of immaculate conduct and citizenship. Exposure, self-confessed exposure, would lose him his place in society, his good name in the world, and, like a bill of attainder, taint his blood and that of all who inherit it. It might well be that he would refuse to give up the sacred privilege of silence for a pardon. It is not difficult to suppose a case where the inquiry of the government was not directed to his crime, but to something immeasurably less important and inconsequential. The benefit to society might be a trifle, compared with the catastrophe to him and his descendants. I am not impressed with the belief that he has no right to stand upon the constitutional privilege of silence, and thus refuse the grace of the legislative or executive power. For the foregoing reasons the rule will be discharged.