## UNITED STATES v. GOODNER et al.

### No. 9173.

District Court, D. Colorado.

Oct. 14, 1940.

Harry S. Silverstein and Harry S. Silverstein, Jr., both of Denver, Colo., for defendants.

SYMES, District Judge.

Ivan E. Goodner, one of the above-named defendants, has filed a plea in abatement to the indictment and a motion to quash. The indictment contains 16 counts charging the use of the mails in connection with a scheme and artifice to defraud. The 15th count alleged violation of the Securities Act, 15 U.S.C.A. § 77a et seq., and the use of the mails in the scheme to defraud, said scheme being the same set out in the first count of the indictment. The 16th count charges conspiracy to violate the Securities Act, 15 U.S.C.A. § 77q, also against devising a scheme to defraud and the use of the mails in connection therewith, 18 U.S.C.A. § 338.

The first count of the voluminous indictment forms the basis for most of the following counts, alleges the six defendants devised and intended to devise a scheme and artifice to defraud, and obtaining money and property by means of false and fraudulent pretenses from a long list of alleged victims named, all scattered throughout Western Colorado, Kansas, Idaho, Montana, Texas, New Mexico and other western states. It then sets forth that the Pioneer Gold Producers, Inc., would be a corporation doing business at Durango, Colorado, with a capitalization of 27,500,000 shares of common stock of one cent par value, and would own a group of five patented claims located in Montezuma County, Colorado, with an option to purchase a certain millsite, and that the said corporation would treat ores of all kinds; that the defendant Goodner would be the president and that certain of the defendants, not including Goodner would, under the name of A. M. Kearns Investment Company, be the fiscal agents and underwriters of said Pioneer Gold Producers, Inc., dominated by Goodner and other defendants, and another corporation, to wit, the La Plata Gold Mines, Inc., would be a Colorado corporation and would be the owners of a certain mine known as the Idaho Mine, apparently a partly developed abandoned property, and that the defendant Goodner would likewise be president of said corporation. The Government then charges that it would be represented through the mails, pamphlets and other literature, that Gold Producers, Inc., was the holder of a

Thomas J. Morrissey, U. S. Atty., and Ivor O. Wingren, Asst. U. S. Atty., both of Denver, Colo., for plaintiff.

lease and option covering a millsite in La Plata County, Colorado, suitable for a custom mill; that there were 27 mines within a radius of eight miles of the millsite, with production sufficient to warrant the erection of a 150-ton custom mill, which could be operated at a profit of $3 per ton, and that thereby investments in Pioneer Gold Producers, Inc., would pay handsome returns to the persons to be defrauded who would purchase its stock; that the millsite would cost $2,500 and the mill could be built for $60,000. This said money would be raised by sale of Pioneer Gold Producers, Inc., stock in the sum of $170,-000; that the money necessary to purchase said millsite and erect the mill would be raised by the sale of Pioneer Gold Producers stock in the sum of $170,000; the truth being, however, that as the defendants well knew, the money so obtained from the victims would not be used for said purpose, but rather to pay the debts of the La Plata Company and the obligations of a corporation known as the La Plata Mountain Gold Mines, Inc., to the defendants Goodner and Goodwin, and on other mining properties.

It is then charged that in order to persuade the victims to send their money to the defendants the latter, under their own names, and under the various names set forth, made false and fraudulent pretenses and promises to the victims in the manner thereafter set out. That it was represented to said victims that their money would be used to build a custom mill and to go into tangible property and for working capital to buy ores, which would be milled and the bullion obtained therefrom sold to the Mint for the benefit of the stockholders in the Pioneer Gold Producers, Inc., whereas in truth and fact the defendants would not use the money so obtained for the purposes represented, but on the contrary to pay off the indebtedness of the La Plata Mountain Gold Mines, including its indebtedness to the defendant Goodner, to develop another property known as the Idaho Mines.

That it was further a part of said scheme that defendants would cause to be organized a new corporation known as Consolidated Gold Producers, Inc., and transfer to it the assets of Pioneer Gold Producers, Inc., and induce the victims to exchange their stock in Pioneer Gold Producers, Inc., for shares in the said Consolidated Gold Producers, Inc., upon the representation that the defendants under the name of the Consolidated Gold Producers, Inc., had not changed their plans to erect a mill on the said millsite owned by Pioneer Gold Producers, Inc., and which had been transferred to the Consolidated Gold Producers, Inc., and that it would be advantageous for said victims who purchased stock of Pioneer Gold Producers, Inc., to trade their stock for Consolidated Gold Producers, Inc., whereas in truth and fact Consolidated Gold Producers, Inc., had been organized by the defendants solely for the purpose of concealing from the victims that the money obtained from them under sale of Pioneer Gold Producers, Inc., had been misappropriated by the defendants.

Next, that the defendants having devised the scheme described, in order to carry it out did mail to the victims named certain literature describing and boosting the scheme and mailed for the purpose of inducing the victims to buy Pioneer Gold Producers, Inc., stock. Further, that the defendants did not intend to comply with the provisions of their Securities and Exchange Commission registration statement.

In many of the following counts it is charged that in aid and promotion of said illegal scheme the defendant Goodner, as president, sent out various letters to the victims.

It is alleged in the plea and motions and admitted by the Government that the Securities and Exchange Commission, through its office in Denver, investigated the sale of the stock of Pioneer Gold Producers, Inc., and Consolidated Gold Producers, Inc., and in the course of their investigation issued a subpoena duces tecum directed to the defendant Goodner, requiring him to appear before it at Denver June 8, 1939, which he did accompanied by his counsel. Our attention is then directed to the Securities Act, 15 U.S.C.A. § 77v(c), which provides that no person shall be excused from testifying or producing the books and papers before the Commission in obedience to a subpoena, on the ground that the testimony or evidence required of him may tend to incriminate him, or subject him to a penalty or forfeiture, but that no individual shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he is compelled to testify "after having claimed his privilege against self-incrimination."

At the time set for the hearing the defendant Goodner appeared personally, and

through his counsel, presented to the Commission in writing his claim of privilege and immunity under the above provision of the statute. The same was filed with the Commission, and receipted for by the latter. Thereupon he was called and did testify and produced certain books, records and documents of the various companies called for by said subpoena, which testimony, it is alleged, was useful to and in aid of the securing and presentation to the grand jury, which returned the indictment in question.

More specifically this defendant testified that the Pioneer Gold Producers, Inc., used its funds to pay payrolls and for work and labor on the Idaho Mine, "thereby disclosing that the moneys raised by Pioneer Gold Producers, Inc. from sales of its stock, were used for other purposes than for the building of a new 150 ton custom mill."

Furthermore, he produced and identified bank statements of the Pioneer showing its deposits and withdrawals and that he, Goodner, drew all checks on account of the La Plata Company, and disclosing how and for what purpose, and in payment of what accounts and debts made by the La Plata Company. And he further disclosed in his testimony that he, Goodner, was the holder with other persons of promissory notes of the La Plata Company, and that thereby the La Plata Company was indebted to him, and that the Pioneer Company, under certain contracts which he identified, owed the La Plata Company $20,000, and identified the books and items showing how the sum was so advanced in cash and securities, and what payments were made by the La Plata Company to or for the account of the defendant Goodner.

Furthermore, he produced and identified books, cash books and journals of the Consolidated Gold Producers, Inc., and testified concerning the same and his, defendant Goodner's, connection therewith. He also testified in detail as to his schooling, education, professional degrees and various occupations; employment and work done in chemistry and laboratory, surveying, and what mining companies and mills and consultation work he had done, especially his connection with the Alaska-Juneau, a large and well-known Mining Company. And further testified he did not plan or design their large mills, and gave the limitations of his work for said company.

He further testified he had drafted without any legal assistance agreements and leases from the Pioneer and La Plata, and signed the same for the latter, pursuant to which Pioneer was to, and did, advance $20,000 to La Plata.

He further testified that he had written, as consulting engineer for Pioneer, a certain report (Ex. 35), concerning the demand for the new custom mill and made the estimates of ore available for treatment at such mill, receiving stock therefor. That he signed said report and furnished the same to the brokers who were selling Pioneer stock, and gave them permission to use the same in selling stock, and furnished other data and estimates of ore reserves, and gave the same to the underwriters and brokers, together with various reports which he wrote or compiled and signed, to be distributed through the mails, which are set forth in the 2nd, 6th, 7th and 8th counts respectively of the indictment. Further, that he had made and caused to be made various blueprints, maps and reports, which he described and identified at the hearing, showing ore reserves in the Idaho Mine.

Defendant then asserts that the charge in the indictment that the chief basis for the scheme to defraud was that the money should be raised by the sale of said Pioneer stock from the persons induced to buy the same, on the assertion and representation that their money would be used wholly and solely to build the 150-ton custom mill on the Pioneer company millsite, and that while said millsite had in fact been purchased for $2,500, that was the only money used for said mill, and that the defendants never intended to, but did, plan not to use any of said funds to construct said mill, but on the contrary intended to, and did, divert and misappropriate the funds for other purposes, including payments to the defendants themselves.

Further, defendant asserts he was required to, and did, produce at said hearing before the Commission his personal, individual bank accounts, cancelled checks and deposit slips and income tax returns, and was compelled to testify concerning the same after he had claimed his privilege and immunity.

The above resume of fact is borne out by the exhibits attached to Goodner's plea in abatement, which consists of Ex. A, a

copy of the subpoena issued by the Securities and Exchange Commission (Ex. B), the written claim of immunity filed with the Commission and receipted for at the hearing and Exhibits C and D, extracts of the official stenographer's report of defendant's testimony at said hearing.

The immunity statute the defendant relies upon, 15 U.S.C.A. § 77v(c), is in recognition of, and compliance of course, with the provision of the Fifth Amendment of the Constitution (the Bill of Rights), which says: "Nor shall [any person] be compelled in any Criminal Case to be a witness against himself." This provision, long regarded as one of the safeguards of civil liberty, should be, and according to the authorities must be, applied in a broad spirit to secure to the citizen immunity from self-accusation, and applies to all proceedings wherein the defendant is acting as a witness in any investigation that requires him to give testimony that might tend to show him guilty of a crime and, United States v. Kimball, C.C., 117 F. 156, at page 160: "The constitutional provision is not directed to defendants, but is a common shield for all persons summoned as witnesses. It is for the protection of witnesses, irrespective of their relation to the proceeding."

A corporation is not a person within the protection of this provision. Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652. And this Amendment may not be asserted by officers and agents thereof in the corporation's behalf, nor can an officer of a corporation in physical possession of the books of the latter plead this immunity against exposing the contents thereof, on the ground they would incriminate him personally, as if the books and papers were his own, Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas. 1912D, 558, where the court said if the corporation were guilty of misconduct he could not withhold its books to save it, and if he were implicated in the violation of law he could not withhold the books to protect himself from the effect of their disclosures. See, also, Grant v. United States, 227 U.S. 74, 33 S.Ct. 190, 57 L.Ed. 423.

For a full exposition of the question we here resolve, we turn to Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110. Counselman was summoned before a Federal grand jury investigating certain alleged violations by officers of certain railroads charged with giving rebates in violation of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. He refused to answer questions as to whether he had received, or knew of any officer of the companies granting, any shippers of merchandise rates less than the traffic or open rate, stating that his answers might criminate him, pleading his constitutional immunity. Mr. Justice Blatchford in the opinion of the court says the proviso applies to any criminal case, and that Counselman was right in refusing to testify because while he was not under investigation, the questions called for answers which showed that his apprehension was if he answered the questions truthfully it might be shown he had violated the Interstate Commerce Act, for which he might be prosecuted, and says this, page 562 of 142 U.S., page 198 of 12 S.Ct., 35 L.Ed. 1110: "The object was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime." And, page 566 of 142 U.S., page 199 of 12 S.Ct., 35 L.Ed. 1110, quoting from Chief Justice Marshall's opinion in the Burr case, United States v. Burr, Fed.Cas.No. 14,692e the following: " 'It would seem; then, that the court ought never to compel a witness to give an answer which discloses a fact that would form a necessary and essential part of a crime which is punishable by the laws.' " And quoting from Emery's Case, 107 Mass. 172–182, 9 Am.Rep. 22, a leading case in Massachusetts, where the court interprets a similar provision in the Massachusetts constitution, the Court says the witness is protected (page 575 of 142 U.S., page 202 of 12 S.Ct., 35 L.Ed. 1110) " 'from being compelled to disclose the circumstances of his offense, the sources from which, or the means by which, evidence of its commission, or of his connection with it, may be obtained, or made effectual for his conviction, without using his answers as direct admissions against him.' "

The court then discusses many state statutes of the nature of the one under discussion here, compelling witnesses to testify in spite of claims that the same may tend to incriminate, coupled with the provision as found in the statute we are discussing that no individual shall be prosecuted as a result of any testimony he is thus compelled to give. The opinion says, page 585 of 142 U.S., page 206 of 12 S.Ct.,

35 L.Ed. 1110, that such legislation cannot abridge the constitutional privilege, and: "We are clearly of opinion that no statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him can have the effect of supplanting the privilege conferred by the constitution of the United States." And goes on to say that in view of the constitutional provision a statutory enactment to be valid must afford absolute immunity against future prosecution. Thus approving the doctrine of the Emery case referred to.

The contention of the Government that under the 5th Amendment it is necessary that a witness claim his privilege against self-incrimination after he has been sworn, upon the asking of a question, the answer to which he feels may have a tendency to incriminate him, is answered by the quotations from Counselman v. Hitchcock, supra, and directly by United States v. Skinner, D.C., 218 F. 870, where, after observing that a witness may testify without asserting his privilege, in which event his testimony is voluntary, the court says, page 879, it is enough if the examining tribunal is informed of the claim of immunity. "It need not be a formal assertion. It is enough if it apprise the examining tribunal, and the law officer of the government conducting the investigation, that the witness is unwilling to answer because the answer may incriminate him, and enough of the manner in which this may be done to enable them to determine intelligently whether there is a likelihood of such incrimination. * * * The circumstances, however, must be such as to show that the tribunal was clearly informed of the claim of the witness and its basis."

The indictment and the testimony the defendant gave (supra) disclose that this rule was fully complied with, for after serving the written notice (Ex. A) on the examining officials, the defendant was duly sworn, examined, and gave testimony which, standing alone, supports the charges in the indictment and is material on the question of his ultimate guilt or innocence. In fact, it might well be said that Goodner's testimony alone is sufficient to support the charges of the indictment, especially as to those counts based on the literature the defendant is charged with preparing and sending through the mails.

In recent years it has become necessary to regulate business activities of different groups of citizens in the conduct of various business activities they may engage in, and to this end Congress has seen fit to vest wide inquisitorial powers in government bureaus and officials charged with this duty. These officials should bear in mind that the powers thus granted them are always subject to the beneficent provisions of the so-called Federal Bill of Rights found in the first ten Amendments to our Constitution, which cannot be impaired in the slightest degree by the Congress.

In the case at bar it would seem the defendant was haled before the examiner and his testimony taken, with full notice to the examining officials that he claimed his immunity under the Fifth Amendment to the Constitution, but nevertheless he was required to give testimony which formed the basis for the charges in the indictment, and which would be sufficient to justify his conviction by a jury if tried. Proceedings such as this are contrary not only to the letter, but the spirit, of the Amendment in question, and require that the plea in abatement and motion be sustained and the indictment quashed as to this defendant Goodner, and that he may go hence without day.