# UNITED STATES v. BELL.

## (Circuit Court, W. D. Tennessee, W. D. June 10, 1897.)

1. CONSTITUTIONAL LAW—SELF-INCRIMINATING TESTIMONY—COMPULSORY AT-
TENDANCE—PENSION EXAMINERS.

In determining whether false testimony, given before a special pension examiner, and on which a charge of perjury is based, was extracted from the accused in violation of his constitutional right to remain silent in regard to matters incriminating himself, the fact that he appeared and submitted to examination without service of subpœna is not conclusive. If, being an ignorant man, he appeared reluctantly, upon the importunity and at the direction of the examiner, who had the power to compel his attendance, he will be regarded as having appeared upon compulsion, as much as if he had come in obedience to a subpœna.

2. SAME—WAIVER OF RIGHT OF SILENCE.

If one, fully cognizant of his constitutional right to remain silent in respect to matters tending to incriminate himself, abandons it, whether under compulsion or otherwise, and essays to speak under oath, he must speak the truth, and may be prosecuted for perjury if he does not; but, before this principle can be invoked, it must appear that the witness' abandonment of his rights was knowingly and understandingly made, and that no undue advantage has been taken of an ignorant witness in the course of an inquisitorial examination.

3. SAME—PROTECTION OF WITNESS.

No statute, rule, regulation, or act of administration can be constitutional which does not in some way protect the right of the citizen under the fifth amendment to be silent in respect to matters tending to incriminate himself, if he chooses to be silent. Whether any given citizen has exercised his privilege of waiving this right, and essayed to speak voluntarily, subject to the pains and penalties of perjury, depends upon the circumstances of each particular case.

4. SAME—EXEMPTION OF WITNESS—PROSECUTION FOR PERJURY.

To secure the full constitutional immunity, so as to allow any inquisitorial, self-incriminating examination to take place, the witness must not only be exempted absolutely from all prosecution for offenses aliunde the testimony he is then giving, but that testimony cannot be made the basis of a prosecution against him.

5. SAME—REV. ST. § 860.

Quære: Whether an investigation by a special pension examiner, under Rev. St. § 4744, as amended by the act of July 25, 1882, is a "judicial proceeding," within the meaning of Rev. St. § 860, which provides that evidence obtained from a party or witness shall not be used against him in any criminal proceeding, etc.

6. SAME.

The immunity offered by Rev. St. § 860, from the use of self-incriminating testimony against the person giving it, is not as broad as the constitutional protection afforded by the fifth amendment, and therefore the witness is not compelled to answer. Counselman v. Hitchcock, 12 Sup. Ct. 195, 142 U. S. 547, followed.

7. SAME—PROSECUTION FOR PERJURY.

Quære: Whether the proviso in Rev. St. § 860, declaring that the immunity thereby afforded shall not exempt the witness from prosecution for perjury committed in giving testimony thereunder, is not inconsistent with the constitutional guaranty.

8. SAME—EXAMINATIONS BEFORE SPECIAL PENSION EXAMINERS.

The examinations conducted before special pension examiners, under Rev. St. § 4744, as amended by the act of July 25, 1882, are almost purely inquisitorial, and no sufficient safeguards are thrown around the witness in respect to the extortion of self-incriminating testimony.

9. SAME—IGNORANT WITNESS—WARNING OF HIS RIGHTS.

Unless a witness, manifestly ignorant of his constitutional right to remain silent in respect to self-incriminating testimony, is informed of that right by a special pension examiner, before whom he is subjected to an inquisitorial examination, so that he may protect himself, or consult counsel if he desires, the examination cannot be used in evidence against him, even on an indictment for false swearing in the progress of the examination itself.

The defendant stands indicted for perjury, as defined by Rev. St. U. S. § 5392, upon an examination before Pension Examiner W. M. Ragsdale, had on the 14th day of November, 1895, at his office, in the city of Memphis.

On the trial the defendant excepted to the introduction of the written, examination, as taken down by the examiner, upon the ground, among others, that the said examination was a violation of his privilege to remain silent upon the matters inquired about, as secured by the fifth amendment to the constitution of the United States, which objection was reserved by the court, and, subject to the exceptions, the document was read to the jury. The defendant also asked the court, among others, to give the following instruction to the jury: "(3) If, from the evidence, the jury find that the defendant appeared before the pension examiner under such circumstances as would induce a man of ordinary information to believe that he was compelled to appear and answer interrogatories touching his conduct with reference to the postdating of a pension voucher, and of the execution of a pension voucher certified by him; and if, from the evidence, you believe that he did not understand that he could not lawfully be compelled to answer interrogatories so propounded by the pension examiner, and that the pension examiner did not warn him of his rights in the premises; and if he did appear and answer questions under such circumstances,—the court charges you that this would, in law, be compelling the defendant to give evidence against himself. And, if you believe from the evidence that the foregoing propositions have been established, you should acquit." He also asked the court generally to direct a verdict upon all the proof in the case.

The examination of the defendant and other persons subjected to examination was undertaken under authority of the following letters:

"(1) Department of the Interior, Bureau of Pensions.

"Washington, D. C., Aug. 12, 1895.

"Mr. W. M. Ragsdale, Special Examiner, Memphis, Tenn.—Sir: Herewith find papers in claim for pension certificate No. 372,580, Hattie, widow of Samuel Woods, Company K, 57 U. S. C. T., for compliance with instructions contained in the accompanying letter from the chief of the law division, dated August 10th, 1895. In making your report, let letters herewith appear as exhibits.

"Very respectfully, Wm. Lochren, Commissioner."

"(2) Department of the Interior, Bureau of Pensions, Law Division.

"Washington, D. C., Aug. 10, 1895.

"Chief of Special Examination Division—Sir: Transmitted with this letter you will find papers in the case of Hattie, widow of Samuel Woods, Company K, U. S. C. Vol. Inf., certificate No. 372,580, together with a report from Special Examiner V. M. Johnson, containing some testimony tending to show that Mr. A. W. Dorsey, of Memphis, Tenn., has been guilty of illegal and fraudulent conduct in connection with a certain check and voucher belonging to this pensioner. Accompanying the papers is one paid and canceled check, and two original vouchers, the execution, indorsing, and cashing of which should be the subject of a scrutinizing investigation on the part of a special examiner, preferably Mr. Johnson. Should criminal conduct be developed, all the evidence should be considered by the United States attorney who is now investigating Mr. Dorsey's conduct relative to pension claims. This letter should appear as an exhibit in any report which the examiner may make.

"Very respectfully, Frank E. Anderson, Chief of Law Division."

At the date of these instructions, two indictments found May 31, 1895, for alleged pension frauds, were pending against Dorsey. These, however, were not connected with this pension of Hattie Woods. The first of these indictments contained five counts, charging Dorsey with the forgery of indorsements upon five several pension checks, belonging to five different pensioners. As to some of the counts a nolle prosequi was entered, and, upon a trial subsequently had, he was acquitted upon the others. The other indictment against him was for the forgery, outright, of the name of another pensioner to an affidavit as to his identity, upon which he was subsequently tried and acquitted. These are probably the frauds referred to in the letter of the pension bureau to Examiner Ragsdale, directing the investigation during which the examination of the defendant in this case was had. After the examination of the defendant in this case, and other persons shown to have been connected with Dorsey in his frauds upon the pension law, and probably as a result of these examinations, on the 23d of November, 1895, another indictment was found against Dorsey, charging him in four different counts with the forgery of the indorsement of still another pensioner, upon as many of his pension checks, upon which a nolle prosequi was subsequently entered. And on the 29th day of November, 1895, as the result of these examinations, and particularly that of the defendant involved here in this proceeding, still another indictment was found against Dorsey and this defendant, Bell, jointly. In the first count they were charged with postdating a pension voucher of one Hattie Woods, of date August 4, 1894, by which her identity was established, and the fact that she was still a widow. By the second count of the indictment, this defendant alone was indicted for having made, as a notary public, a false certificate of the jurat to this same voucher of August 4, 1894. They were put upon their trial, which resulted in the conviction of Dorsey, and the imposition of a fine by the judge then presiding, but the defendant Bell was acquitted upon both counts of the indictment, which trial was in December, 1895. On the 23d of November, 1896, another indictment was found against Dorsey, the first count of which charged him with the offense of withholding considerable sums of pension moneys belonging to one Brown, heretofore mentioned, the second count of which charged him with the offense of withholding considerable sums of pension money belonging to another pensioner, Coleman, alias Driver, being one of the same pensioners also mentioned in the other indictments. Upon that indictment Dorsey had just been tried, and convicted upon the first count, but acquitted upon the second, and is now awaiting sentence. On the 26th of November, 1896, an indictment was found against the defendant, Bell, charging him with perjury in his examination before Commissioner Ragsdale, upon which he is now on trial, being the same indictment we are now considering.

It will be observed from this recital that, at the time Ragsdale was directed to undertake this investigation against Dorsey, there were indictments then pending, but not connected with the pensioner Hattie Woods; and at the time of the examination of this defendant by Ragsdale, on the 14th of November, 1895, there was no indictment pending either against the defendant or Dorsey about any matter relating to their operations with regard to the pension papers of Hattie Woods; but it is evident that the previously enlarged investigation against Dorsey and others connected with him had developed the manipulations which had taken place in respect of this Hattie Woods pension, and therefore Examiner Ragsdale was directed to investigate it. No mention is made in his letters of instruction of the defendant, Bell, but only Dorsey, whose name appears as a witness upon the certificate and voucher of the 4th of August, 1894, involved in this case. The examiner was not specifically instructed to investigate the connection of the defendant Bell with that voucher, or the Hattie Woods pension papers, but only that, as there was testimony tending to show that Dorsey had been guilty of illegal and fraudulent conduct in connection with a certain check and voucher of the pensioner Hattie Woods, he was told that "the execution, indorsing, and cashing of this check and voucher should be the subject of a scrutinizing investigation on the part of a special examiner," etc., and this was his authority for undertaking the examination of Bell, involved in this indictment for perjury.

The proof here develops the fact that the defendant Bell, who is a negro, was for many years a porter about the mercantile houses of this city, and afterwards a Pullman-car porter. By the easy-going methods customary with us,

he obtained a license to practice law, and, by like methods, was appointed a notary public. Thus armed and equipped, he took an office or desk room with the Dorsey above mentioned, who is also a negro with license to practice law. Dorsey was engaged in the business of a pension agent, or, as he styled himself, the "subagent" of certain pension practitioners of Washington City. His business was to help his negro clients who were pensioners or claimants for pensions in and about their pension business, the favorite part of it to him being the handling of their pension money, and the safe-keeping of it for them; but it may be assumed, for the purposes of this case, that he kept large parts of it for himself. This office association with the defendant was evidently useful to him if it had no criminal conspiracy to commit frauds upon the pension funds. The defendant testified in this case that on pension days, when vouchers were to be signed, the office was crowded, and it was customary to sign such papers as Dorsey and those aiding and helping him would present to him in his capacity as notary public, and without very much scrutiny on his part as to the details of the business; and it can hardly be doubted but that such is the fact, and perhaps this want of scrutiny was a part of the scheme to perpetrate these frauds. On the 4th day of August, 1894, the pension voucher of Hattie Woods, of that date, was executed before the defendant as a notary public. She signed with her mark, and this Dorsey and one Allen and another negro were her attesting witnesses. By the printed depositions, they swore that they were acquainted with Hattie Woods, and that she was the identical person represented, and she had never remarried since the death of her husband, and that, if she had, they would have known it, and that she was without means of support except her labor, and that her minor children were still living, and had not been abandoned. It appears by the same printed form that Hattie Woods herself, on the 4th of August, swore before the defendant, as a notary public, that she was the identical person named in the pension certificate of the 24th of April, 1893; that she was the widow of the deceased soldier Hattie Woods; that she had never remarried since his death; that she had no other support except her labor; that she had two children dependent upon her, that had not been abandoned; and named her residence. The defendant attached on the printed form his signature and seal as a notary public to the jurat to the foregoing affidavit and depositions of the two witnesses. The jurat also was a certificate that the pensioner had exhibited to the defendant, as a notary public, her pension certificate as described, and had signed in his presence duplicate receipts for the sum of $36, payable by check of the pension agent, of date August 11, 1894, which duplicate receipts were also signed with her mark, and witnessed by the same two witnesses above mentioned. The defendant's jurat is in the following words, to wit:

"(The Pension Certificate Must be Exhibited to the Magistrate when this Voucher is Executed.)

"State of Tennessee, County of Shelby—ss: Personally appeared before me, this 4th day of August, 1894, the above witnesses, A. W. Dorsey, of Shelby county, Tennessee, and Daniel Allen, of Shelby county, Tennessee, whom I believe to be credible persons, and the pensioner, above named, and made oath in due form of law to the truth of the foregoing statements subscribed by them; and I certify that the aforesaid pensioner has this day exhibited to me her pension certificate, above described, and signed the following duplicate receipts in my presence.

"[Magistrate's signature]               E. R. Bell,
"[Official character]                   Notary Public.

"[E. R. Bell, Notary Public, Shelby County, Tenn.]"

On the 4th of August, 1894, when this certificate was made and notarial seal affixed, the pensioner Hattie Woods was in fact in Missouri, a servant in a Memphis family, having a temporary home at that place. This was so conclusively proved, and it is not denied, and the defendant's counsel, before the jury, admits it to be a fact. But it is in proof that she received the blank form of the voucher before she left Memphis, in June, 1894, to go to Missouri. The form of the voucher itself has a printed warning and instruction that "the voucher may be executed on or after 4 August, 1894, but not before." Before she left the city, she carried the voucher to Dorsey, and left it with him,

81 F.—53

with instructions to collect the money, and pay it to a creditor of hers in this city, whom she named. When the 4th of August, 1894, arrived, the voucher was executed in Dorsey's office, attested by the witnesses as aforesaid, and certified by the defendant, precisely as if the pensioner were then present before them, as the law required she should be, with her pension certificate. By the way, it may be further said that she also left her pension certificate with Dorsey along with the voucher. Duplicate receipts were executed in her absence in the same way, and the money was collected, and it is not denied, but admitted, that Dorsey paid it to the pensioner's creditor, according to her instructions. Her signature was made by mark, which, of course, she never herself made, although it was certified and witnessed as such.

Upon this state of facts, as already stated, the defendant and Dorsey were acquitted upon the indictment for postdating the voucher, and the defendant of making a false certificate, probably because, no harm being done to anybody so far as the direct loss of money was concerned, it was not considered that the intent to defraud the United States was sufficiently proved. Whatever the reason may have been, they were acquitted in December, 1895. Nevertheless, a year afterwards, in November, 1896, the grand jury found this indictment for perjury against this .defendant, in his examination before Ragsdale. That examination took place on the 14th of November, 1895. The testimony about the circumstances attending it are somewhat conflicting. The examiner himself testifies that he personally notified the defendant that he wished him to appear before him for examination, to which the defendant assented; but, not appearing, the examiner again went to his office, and told him that he must appear, and be examined, which the defendant again promised to do. Possibly there was more than one visit to the defendant's office, asking him to appear. No subpoena was ever issued or applied for. The deputy marshal testifies that he was told by the examiner that the defendant was wanted for examination, and requested to notify him, and that, meeting him on the street, he told Bell that Ragsdale wanted to see him for examination. There is a misrecollection on the part of the deputy marshal, and some confusion as to the date of this occurrence. The marshal had a capias for Bell issued the next day after the examination, and executed about the same time. He does not remember whether he had that capias at the time he met Bell or not, but is inclined to think he had. At all events, Bell did appear on the 14th of November, 1895, and was examined by Ragsdale. The defendant himself testifies that he did not wish to go before Ragsdale for examination, although he had promised to do so; that Ragsdale had told him several times he must come, and that, if he did not, he would take steps to compel him to come; that he came to his office several times afterwards, and either told him or left word for him to come; and, meeting the deputy marshal on the street upon the morning of the examination, the marshal told him he had a subpoena for him to appear before Ragsdale, as he understood it, and he went to his office supposing that he had been subpoenaed to do so. It is quite clear that the marshal did not get his capias until after the examination, and it is somewhat difficult to determine whether the defendant has confused the statement of the marshal that he had a capias for him with the statement that he had a subpoena to appear before Ragsdale. The defendant insists that the notification made by the marshal was on the day of the examination, and that the notification by the capias came afterwards. The marshal not being quite clear about it, it remains uncertain.

When Bell did appear before the examiner, according to the testimony of the latter, he was interrogated with questions which do not appear in the written document, to which questions Bell gave his answers, and they were reduced in narrative form to writing by the examiner, as follows:

"My age is 51. Am a notary public and lawyer. Post office, 13 Gholson street. I have been well and personally acquainted with this pensioner, Hattie Woods, for a number of years, and have executed several vouchers for her. The vouchers herewith shown me, purporting execution August 4, 1894, and November 5, 1894, bear my genuine signatures and jurats, and she was personally present, and properly identified and sworn, on each occasion. I remember the execution of these vouchers better than those of others whom I did not personally know. Yes, sir; I personally know A. W. Dorsey, Daniel Allen, William H. Mills, and T. W. Bradford; and they were properly sworn to said vouchers as to the continued widowhood of the pensioner Hattie Woods, and

said vouchers were executed on the date that they bear, to wit, August 4, 1894, and November 5, 1894. No, sir; there is no possibility of my being mistaken about this. I knew all the parties personally, and it was an invariable rule that the pensioner or claimant and witnesses must always be present when I executed a voucher. I have heard this read, and it is correct.

"[Signed] E. R. Bell. [And sworn to.]"

Two vouchers are named in this examination, but only one has been introduced in evidence, and is involved in the inquiry relating to the occurrences of August 4, 1894. The examiner testifies that, in the taking of this examination, no compulsion was used; that he had no scheme or intention of entrapping Bell into false swearing, for the purposes of this prosecution; that he was engaged about his business of carrying out his instructions to learn from all the parties to the voucher and the checks, by sworn examinations, all that they knew about them, for the purpose of making his report to the bureau at Washington; that he asked such questions as would develop the facts he wanted to know; and that, while he did not undertake to reproduce the precise language or words of the defendant, he put them down in substance as they appear. He issued no subpœna, and made no threats of issuing one, and he used no language or tone of command or authority to induce or force Bell to submit to the examination. Bell always expressed a willingness to be examined, and made no objection to it. He did not, however, notify Bell that he had the right to remain silent, and refuse to answer any of these questions. That matter was not suggested by either himself or Bell, and nothing was said about it. The defendant, as a witness in his own behalf, testifies that, when he came to the office under what he supposed was a subpœna by the marshal, he started to leave the office with the intention of consulting a lawyer, but the examiner told him that he must remain, and that he could not leave again until the examination was had. Supposing that he was under compulsion to stay as a witness, the defendant remained, and reluctantly testified. He says that he did not then know of any right that he had to remain silent. He did not know anything about his constitutional rights, and, if it had occurred to him, he would have asserted them. He had an idea that he ought to consult a lawyer, but understood that he was not allowed to go away for that purpose. He does not say that he told Ragsdale that he wanted to consult a lawyer, and was refused, but only that he had in his own mind a desire to that end, which was not carried out, because of the arbitrary and commanding authority of the examiner. He supposed that the examiner had all the official authority to detain him, and compel him to submit to an examination, and in that belief he yielded to his importunities. He further says that Ragsdale did not use his language, nor put down all or just what he did say, but that he put it in a form to suit himself. He says that he did not say to Ragsdale that he remembered the fact that Hattie Woods was present at the time he certified she was, but told him precisely the facts that he has detailed here in his testimony now as to the occurrences of the 4th of August, 1894, in Dorsey's office; that he told Ragsdale there was a large crowd present, signing papers on that day; and that Dorsey came in, and laid the pension certificate and the vouchers before him, with the marks already made, and the signatures already written, and he assumed, without looking around to see, that she was present, and so certified and swore the witnesses to the deposition. He further says he told Ragsdale that it was customary to satisfy himself that the witness was present; that he believed on this occasion she was present, because of that custom. He did not tell him what appears in the examination, that he knew her so well personally and exceptionally that he had a positive recollection that she was present from his exceptional acquaintance with her, and that that appears in the examination without his having said it. He says he signed it without scrutinizing it to see that all he had said or just what he had said went down, supposing the examiner had a right to put down so much of it as he wanted; that he did not know the effect of that which was done, and did not understand the purport and meaning of the document. Since these investigations took place, the defendant testifies that he has abandoned the practice of the law, and gone back to the business of porter on a Pullman car. He states that he found that he did not have sufficient knowledge to practice law; that he did not understand pleading and practice, and found himself at a disadvantage, so that he always had to apply to other lawyers to show him how; and, while he had plenty of

clients, he felt incompetent to attend to the business, and concluded to quit it. He says that he did not, through his knowledge of the law or otherwise, know anything about his right to be silent, nor how to claim the right at the time of this examination.

The defendant appears to be a negro above the average intelligence of the men of his race. He uses good language, and answers questions intelligently and comprehensively, but he does not appear to be very quick or alert in his mental operations. He does not have the appearance or demeanor of a self-assertive and aggressive man, and is not a person who would be likely to protect himself by assertiveness and aggressiveness without being sustained by the advice of others. The defendant proved a good character, his former employers stating that he was an efficient and faithful porter, truthful and honest, and that they would believe him on oath. The indictment predicates perjury of the statement that the pensioner Hattie Woods appeared before the defendant on the 4th day of August, 1894, and that she made oath in due form of law to the truth of the statement contained in her affidavit, whereas in fact she did not personally appear before him, and did not make oath to the statements made in her affidavit. The plea of the defendant is, "Not guilty."

C. B. Simonton, Dist. Atty., and Thos. M. Scruggs, Asst. Dist. Atty., for the United States.

Cassells & Cassells, for defendant.

HAMMOND, J. (after stating the foregoing facts). In support of the direction which has just been given for the acquittal of the defendant, the court feels that it is incumbent upon it to express the considerations which have led it to that conclusion, being fully impressed with the importance of the rulings that are now made in relation to the administration of the pension bureau for the protection against peculation of the vast sums annually appropriated for pensions.

The conclusion has been reached that the objection is well taken to the document containing the result of the examination of the defendant had before the examiner of the pension bureau, and that it lawfully cannot be used in evidence against him upon this prosecution for perjury in the making of the oath by which that examination was verified by him; wherefore the exception taken by the defendant, and reserved by the court, is now sustained, and the document is excluded from the consideration of the jury. The necessary result is the acquittal of the defendant.

Possibly, the court would also, under other conditions, submit the question of the defendant's compulsion to the jury in the terms of the special instruction asked by the defendant in that behalf, and fully set forth in the foregoing statement of facts accompanying this opinion; but it is unnecessary to submit that question to the jury, for the reason that the court is of the opinion that the compulsion is thoroughly established by the testimony of the examiner himself, and without reference to the conflicting testimony as to the circumstances attending the appearance of the defendant before him for that examination.

In Boyd v. U. S., 116 U. S. 616, 6 Sup. Ct. 524, it was distinctly held that it is sufficient compulsion to bring a case within the prohibition of the fifth amendment to the constitution of the United States that a rule of evidence prescribed by statute would operate disadvantageously to him in the event the citizen refused to obey an unlawful order to produce evidence against himself, it being held that

it is equivalent to the compulsory production of papers to make the nonproduction of them a confession of the allegations which it is pretended they will prove; and in the concurring opinion Mr. Justice Miller says:

"Though the penalty for the witness' failure to appear in court with the criminating papers is not fine and imprisonment, it is one which may be more severe, namely, to have charges against him of a criminal nature taken for confessed, and made the foundation of a judgment of the court. That this is within the protection which the constitution intended against compelling a person to be a witness against himself is, I think, quite clear."

And he placed the decision in that case upon the ground that it was a violation of the fifth amendment to the constitution of the United States, that no person shall be compelled in any criminal case to be a witness against himself, and that it was not a case of the unlawful seizure and search of private papers, in violation of the fourth amendment. The chief justice agreed in this view, while the other members of the court thought it was a violation of both of these amendments. Whatever may be thought of this difference of opinion, the case establishes beyond doubt that the compulsion prohibited by the fifth amendment is not alone physical or mental duress, such as comes from unlawful commands and authoritative orders by those engaged in extorting testimony, but comprehends also that lesser degree of compulsion which subjects the citizen to some important disadvantage by the use of means to procure the evidence which it is desired should be extracted from him.

Here the compulsion resides in the state of mind which existed in the defendant at the time he was subjected to the inquisitorial examination that took place. It is true that he was technically not under the compulsion of a subpoena, for none had been issued; and if we take alone the examiner's testimony, and leave out of view all that the defendant says, the most that can be affirmed in that regard is that the defendant waived the issuance of a subpoena, and came at the solicitation and upon the importunity of the examiner; and he occupies precisely the same attitude as he would have occupied if a subpoena had been issued and served upon him. The fact that he did not by his conduct insist upon the issuance of a subpoena, and that he did not force measures to the extent of requiring the examiner to resort to the powers which he had of compelling him to appear for examination, does not make his examination any the less compulsory, if it shall appear that it was not entirely voluntary. He was directed and importuned by the examiner to come, and, that official having the power to compel him to come, if he should be recalcitrant about it, his coming in compliance with the demand that was made upon him may be taken to be tantamount to a subpoena.

Mr. Justice Bradley said in that great opinion from which we have just quoted that:

"It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be, 'Obsta principiis.' We have no doubt that the legislative body is actuated by the same motives, but the vast accumulation of public business brought before it sometimes prevents it, on a first presentation, from noticing objections which become developed by time and the practical operation of the objectionable law."

It would be a stealthy encroachment upon the rights of this citizen, closely viewing the relative situation between him and the pension examiner, to hold that he voluntarily appeared on this occasion for examination.   He was a negro, accustomed to obedience to white men, and particularly obedience to those having or assuming authority over him to command; and I have no doubt, upon the examiner's own statement, that this citizen was before him upon compulsion.   This being so, it is unnecessary to submit the question to the jury whether the defendant voluntarily submitted himself to this examination, as asked for in the special instruction.

Neither is it necessary to submit to the jury the other question of fact submitted by that instruction, relating to the defendant's state of mind in regard to his knowledge of his rights in the premises to stand mute, and refuse to be examined upon any subject involving his own incrimination.

The district attorney has pressed with great earnestness upon the court and jury the fact that this defendant is not a common, ignorant negro, but that he was above the average intelligence of his race, so far that he was ambitiously inclined, a lawyer and a notary public, and presumably as well acquainted with his civil and constitutional rights in this behalf as other lawyers and notaries public might be presumed to be.   But having again in view what Mr. Justice Bradley has said, and what all English-speaking judges have said from almost time immemorial of the duty of the courts to see that the citizen is protected against stealthy encroachments upon his immunity from the exercise of an unconstitutional power, the fact cannot be overlooked, after all, that this negro lawyer and notary public was only a negro porter, having no fair claims to be considered an educated and well-advised lawyer, capable of taking care of himself.   He was not.   Probably he never heard of this constitutional provision, and his long-established right to stand silent, and refuse to answer, when his answers might not only involve him in criminal prosecution, but submit him to the pains and penalties of yielding to the human temptation to sustain his wrongdoing by false swearing, or lose his office by removal at the hands of the state authorities, or his license as a lawyer at the hands of some court, or to be in many ways subjected to material losses and penalties by reason of his false official certificate.   He was just in the situation where a man should and would, if properly advised, keep his mouth shut, and defy those who would compel him to speak concerning his conduct in the matter which had been challenged. Now, it is conceded that this examiner did not warn him of his right to be silent, as it is the duty of all officers to do when about to examine one who may be incriminated by his testimony.   It may be conceded that there is no imperative obligation on the judge or other magistrate or officer who commences the examination of one who is involved by danger of criminal pursuit to warn the citizen of that danger, in the sense that, if he neglects or refuses to do so, the citizen can complain against the magistrate; and it may be conceded that it is a personal privilege to stand silent, that may be waived, and, further, that it is the duty of the citizen himself to

claim his privilege whenever it is in danger. But this is all beside the question. It is the common practice and the recognized course of procedure that the judge or magistrate or other official does warn the proposed witness of his danger and his privilege to avoid it by silence, and it was not done in this case. That is one of the facts. If it further appear that the given witness was especially ignorant of his privilege, by reason of his conditions, the duty to warn is increased; and, where it has not been done, the claim of the citizen for protection against encroachment by judicial counteraction, when confronted with his oath in any way, is enlarged.

Look at the situation here for one moment. An ignorant negro man, brought before an official for whom naturally he must have great regard in respect of his authority, is taken into the office of the official, which, while it is a public office, is not an open court, but more like a private corner; and, separate and apart from all the world, with only those two, he is subjected to a close, presumably artful, and necessarily an inquisitorial, examination, intended to develop whatever criminality may have existed in the transaction with which the witness has been concerned, whether it relates to him or other persons; and this without any attendance of counsel, without any previous consultation with counsel, and without any warning by the official of his right to be silent—absolutely silent—so far as every question that was put to this witness was concerned, as we may infer from the nature and character of the document itself, and in total ignorance of his privilege in the premises. It is idle to say, in view of such circumstances, that this citizen had voluntarily appeared for his examination; that he had knowingly waived his privilege of being silent, and answered with a full responsibility of one who was aware of that which he was doing, and of the magnitude of its importance to him in many and divers directions. There is nothing to be considered by the jury or settled in relation to the conflicting testimony on this point. Upon the examiner's own statement of the case, this citizen was testifying in ignorance of his rights, and without any knowledge of his privilege, and under sufficient compulsion by him.

We have, then, the simple question whether an ignorant citizen, subjected to such an inquisitorial examination as these facts show, may be prosecuted for false swearing in his answers to any questions asked, without an infringement of the Anglo-American and Anglo-Saxon prohibition against compelling any man to be a witness against himself. Every moralist would answer this question in the affirmative, upon the ground that, no matter how or when or where one speaks, one should speak the truth, and be punished for speaking falsely. But every lawyer knows that the law of perjury or false swearing never has proceeded upon that high moral ground; that of many oaths it is impossible to predicate criminal perjury or false swearing; and that we must therefore lay aside the high moral sentiment, and look to the kind of false oaths which are indictable. It may, for our general purpose, be affirmed that every indictable oath is made under compulsion, and that that circumstance is never a defense in perjury. Indeed, it need never be voluntary to be indictable, and the fact that it is voluntary never is an essential ele-

ment of the crime of false swearing. The voluntary quality of this proceeding before the pension examiner does not so much hinge about any compulsion in its relation to the crime of false swearing that was undoubtedly committed on this occasion as about the right not to swear at all, which was disregarded and violated by the examiner. Can the government take advantage of its own wrong, inveigle or drive or permit the citizen, too ignorant to protect himself, to make an oath which he need not take under any compulsion, and then insist upon the pains and penalties of perjury that he shall tell the truth? Truth-telling may be the highest virtue, but may the fifth amendment be violated to enforce it? We answer no.

We now come to the consideration whether or not the fifth amendment has been violated by the statutes authorizing these proceedings, as they have been interpreted and acted upon by the examiner on this particular occasion. To avoid all misapprehension, it may be stated once for all that if a citizen fully cognizant of his privilege abandons it under compulsion or otherwise, and essays to speak under oath before an authorized officer, he must speak the truth, and may be prosecuted for perjury if he does not. At least, this will be conceded for the present; but the ruling we make here is that, before that principle can be invoked, it must appear, as it must appear in all cases of abandonment and waiver of rights, that the abandonment was knowingly and understandingly made, and that no undue advantage was taken of the ignorance of the victim of inquisitorial investigation in the process of his examination. To be more specific, in its application to this case, the pension examiner ought to have given the defendant warning of his danger, advised him of his right to stand absolutely silent as to any inquiry that might involve him in a criminal prosecution, and given him an opportunity, if necessary and if desired, to engage and consult counsel before he proceeded to answer the inquisition. We do not say that this is necessary in all cases, nor that there is any statutory or other obligation upon the examiner to do it in any case, but only that, in the existing state of congressional legislation upon this subject, the examination cannot be given in evidence upon a prosecution for perjury in answering the questions unless it shall appear that the citizen, having the right to stand mute, understandingly waived that right, and gave answer to the questions. No statute, rule, or regulation or act of administration in the given case can be constitutional which does not in some way protect the right to be silent if the citizen chooses to be silent. Whether any given citizen has exercised his right to waive his privilege, and speak voluntarily, subject to the pains and penalties of the statutes against perjury, depends upon the circumstances of each particular case, and upon those alone. In this case the defendant did not waive his privilege under the fifth amendment, under the facts above stated.

Of course, such a ruling as this cannot be passed without sufficient reference to the adjudicated principles and cases relating to the subject of this constitutional privilege in its application to a case like this. I have already mentioned that it could hardly have been expected that this defendant, when confronted with an inves-

tigation concerning the making of his notarial certificate, should admit that it was false. He might be expected to swear that it was true until at least, as on this trial, its falsity was put beyond all question, for that would be the human tendency of one capable of making a false certificate in the beginning. The examiners probably already knew that it was false, though it does not appear in the evidence here, except by inference, that they had then found out that Hattie Woods was in Missouri, and not in Dorsey's office, when the certificate was made. Why were they not then contented to prosecute on that conclusive evidence, as they must have been under Rev. St. § 860, if that applies, since they knew that nothing the defendant would say upon this examination could be used against him for any offense previously committed in respect of his false certificate? Of what value was this examination in view of that section, and to what pending issue did it appertain, or to what was it pertinent? Bell might be used as a witness against Dorsey, no doubt; but he was asked nothing about Dorsey's wrongdoing in the premises, and the examination was confined to Bell's own conduct. His counsel has argued that this shows that the only purpose of this inquisitorial proceeding was to lay the foundation for this indictment for perjury. The examiner denies this, and it is altogether probable that his only purpose was to carry out his instructions, and fully develop the facts for the information of the authorities and prosecutions of offenses. This may relieve the examiner of the imputation of inveigling or leading Bell into the temptation of false swearing, in order to entrap him; but, in its relation to Bell himself, the proceeding was none the less dangerous to him, and its effect on him and his constitutional rights was none the less disastrous because the examiner did not intend to entrap him. He was entrapped as a fact by his own yielding to the temptation to take the bait, and sustain his false certificate, by standing by it with his oath.

As long ago as A. D. 1700 a motion was made for an information against Dummer for perjury in a trial between the king and Fitch. In answer to this question, "whether he had received eight hundred pounds for passing his accounts," Holt, C. J., said:

"If the question had been fair, we would have granted an information; but this question was in effect whether he was guilty of bribery, which it could not be expected he would own. You may indict him, but we will not grant an information." Rex v. Dummer, 1 Salk. 374.

Here the witness has been indicted, but the questions put to him were none the less unfair, as Lord Holt conceived them to be; and if they were not only unfair, but unauthorized, without a warning to the defendant of his right to be silent, can they be admitted in evidence to sustain an indictment for perjury, without impinging upon the protection afforded by the fifth amendment to the citizen? If the witness in the case before Lord Holt had been as secure as this witness in a privilege to remain silent as to the question asked, would he not have warned him that he need not answer a question which might subject him to the pains and penalties of perjury, if he yielded to the temptation he suggested? He certainly would have done so. Whatever may be said of the necessity of allowing the executive department

of the government to protect the funds committed to its hands for distribution among the pensioners against peculation, that consideration cannot override the obnoxious element that inheres in this method of inquisitorial examination by the pension examiners. The statutes which have been framed, and under which they are proceeding, do not sufficiently guard the citizen against an invasion of his privileges in this behalf. We are not now prepared to say that they are unconstitutional in their entirety, and it is not intended to so decide, but only that, without a resort in practice to the habit of safeguarding the citizen against any invasion of his privilege not to be compelled to testify against himself, they may result in a very disastrous overthrow of his privilege by an unconstitutional interpretation in the administration of their powers by the pension examiners. It will not do to rely upon the theory that every citizen can take care of himself in such a purely inquisitorial examination. It is not like the examination that takes place in open court, in the presence of counsel and the bar, and before judges, who are in the habit of exercising the power, if not following the duty, of warning every witness against the danger which confronts him when he is called upon to testify about incriminating matters. And, owing to this peculiar nature and character of the examination itself, it needs more watching to prevent an encroachment upon the citizen's constitutional privileges, which Mr. Justice Bradley has said the courts must guard; and, if the courts must guard them, so must the pension examiners, in the administration of their powers, which are quasi judicial in themselves.

In the very latest emanation from the supreme court of the United States upon this subject, we have Mr. Justice Brown saying:

"The maxim, 'Nemo tenetur seipsum accusare,' had its origin in a protest against the inquisitorial and manifestly unjust method of interrogating accused persons which has long obtained in the continental system [and Mr. Justice Brown might have added "suspected persons"], and until the expulsion of the Stewarts from the British throne, in 1688, and the erection of additional barriers for the protection of the people against the exercise of arbitrary power, was not uncommon even in England. While the admissions or confessions of the prisoner [or suspected person], when voluntarily and freely made, have always ranked high in the scale of incriminating evidence, if an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, which is so painfully evident in many of the earlier state trials, notably those of Sir Nicholas Throckmorton and Udal, the Puritan minister, made the system so odious as to give rise to its total abolition. The change in the English criminal procedure in that particular seems to be founded upon no statute and no judicial opinion, but upon a general and silent acquiescence of the courts in a popular demand. But, however adopted, it has become firmly imbedded in English as well as American jurisprudence. So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a denial of the right to question an accused person a part of their fundamental law; so that a maxim which in England was a mere rule of evidence became clothed in this country with the impregnability of a constitutional amendment." Brown v. Walker, 161 U. S. 591–596, 16 Sup. Ct. 644.

This protection applies just as much for suspected persons as for accused persons, the language of the constitution being, "No person shall be compelled in any criminal case to be a witness against him-

self;" and in the very case that Mr. Justice Brown was deciding for the supreme court of the United States the witness had not been accused in any formal and ceremonious indictment, and was only a witness before the grand jury to give evidence against another. And this point was also decided in the case of Counselman v. Hitchcock, 142 U. S. 547, 12 Sup. Ct. 195. In Brown v. Walker, just cited, it was held that that case was an exception to this principle of protection only because the interstate commerce statutes had taken the witness entirely outside the domain of criminal prosecutions by a statutory pardon, with which feature of this case we shall presently deal. Similar expressions of indignation against the inquisitorial system are to be found in the cases of Boyd v. U. S., supra; in the case of Interstate Commerce Commission v. Brimson, 154 U. S. 447–478, 14 Sup. Ct. 1125; in Counselman v. Hitchcock, 142 U. S. 547, 12 Sup. Ct. 195; in Re Pacific Railway Commission, 32 Fed. 241–250, by Mr. Justice Field; by Mr. District Judge Grosscup in U. S. v. James, 60 Fed. 257; and in many other cases, and by juridical writers and publicists everywhere.

I wish again to call attention to the case of Brown v. Walker, to remark that Mr. Justice Brown in that case very carefully states the limitations that exist upon this prohibition against inquisitorial examinations, for the purposes of self-incrimination. and refers to the classes of cases that constitute an apparent exception to the general prohibition as follows:

"Stringent as the general rule is, however, certain classes of cases have always been treated as not falling within the reason of the rule, and therefore constituting apparent exceptions. When examined, these cases will all be found to be based upon the idea that, if the testimony sought cannot possibly be used as a basis for or in aid of a criminal prosecution against the witness, the rule ceases to apply, its object being to protect the witness himself. and no one else; much less that it should be made use of as a pretext for securing immunity to others."

Mark his language: "If the testimony sought cannot possibly be used as a basis for or in aid of a criminal prosecution against the witness. the rule ceases to apply." And mark particularly that he includes testimony sought to be used as a basis for a prosecution, as this testimony is now sought to be used in this prosecution for perjury. In other words, to allow such an inquisitorial, self-incriminating examination to take place, the witness must be exempted absolutely from all prosecution, not only for offenses aliunde the testimony he is then giving, but that testimony cannot be made the basis of a prosecution against him, and it is manifest that the immunity of the constitution cannot comprehend full protection unless this be so.

Here I may as well remark, also, that from the time the interstate commerce law was passed, until now, those who were affected by it and put under restraint by it have been active and diligent in every direction to escape its restraints, and they have taken shelter within this constitutional provision for that purpose; and the decisions that have been made in recent times by the supreme court of the United States refer to controversies that have been instigated or instituted with the purpose to secure the protection of this amendment against the operations of the interstate commerce law. But it is to be especially noted that the analogy between the interstate commerce law

and the proceedings before these pension examiners is almost perfect, and while the powers of the pension examiners in making their examinations have not been challenged as the powers of the interstate commerce commission have been, and the citizens who have been subjected to inquisitorial examinations by the pension examiners have not been of a character of wealth and capability to defend and protect themselves against the operation of laws designed for the efficient detection of frauds against the pension funds, as the others have been, the underlying principles, so far as they relate to the question in hand, are precisely the same; and therefore we may safely appeal to these interstate commerce decisions and statutes for a safe guide out of the difficulties and perplexities that surround us in this case.

Before the amendment to the interstate commerce act of February 11, 1893 (27 Stat. 443; 2 Supp. Rev. St. p. 80), the statutory immunity offered to citizens about to be examined was found only in Rev. St. § 860, relied upon in this case.    That statute reads as follows:

"No pleading of a party, nor any discovery or evidence obtained from a party or witness by means of a judicial proceeding in this or any foreign country, shall be given in evidence, or in any manner used against him, or his property or estate, in any court of the United States, in any criminal proceeding, or for the enforcement of any penalty or forfeiture: provided that this section shall not exempt any party or witness from prosecution and punishment for perjury committed in discovering or testifying as aforesaid."

It is not intended to base this judgment upon the peculiar phraseology of this statute, but to assume that it offers the immunity it contains to witnesses examined before the pension examiners.  Nevertheless, it is important to call attention to the fact that the language is: "No pleading of a party, nor any discovery or evidence obtained from a party or witness by means of a judicial proceeding in this or any foreign country, shall be given in evidence," etc. Now, are the proceedings before a pension examiner upon one of these investigations judicial proceedings?   Or can it be claimed that they are within the language of the statute?   If they are not, then there is no act of congress offering any immunity to those witnesses who are subjected to these inquisitions of the pension examiners, and we have, to its fullest extent, the odium that exists against such proceedings; and it may well be suggested that, unless they can be construed to fall within this statute as judicial proceedings, there can be no pretense of any statute that will protect them from the imputation of being wholly and entirely unconstitutional, for want of such immunity to the witnesses who are proposed to be examined.   As before remarked, it is not desired here to decide that question, and it is passed with the assumption that these proceedings before the examiners are within the language of section 860 of the Revised Statutes, and that, therefore, that immunity is offered to the witnesses.   But it was precisely that immunity which was held to be insufficient in the case of Counselman v. Hitchcock, supra, and, because of its insufficiency, the witness in that case was held not to be subject to the compulsory process of compelling him to answer.   Therefore he had an absolute right to stand silent, and there was no power anywhere to compel him to speak.

By the act of February 11, 1893, above referred to, this infirmity

in the interstate commerce law has been cured by an amendment which reads as follows:

"But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify or produce evidence, documentary or otherwise before the said commission or in obedience to its subpoena or the subpoena of either of them, or in any such case or proceeding, provided that no person so testifying shall be exempt from prosecution and punishment for perjury committed in so testifying."

It is to be observed that this immunity goes far beyond Rev. St. § 860, and exempts the witness from all manner of prosecution except that of perjury in his testimony before the commission; but it is also to be observed that congress confines this enlarged immunity to witnesses testifying before the interstate commerce commission, and has not extended it to other witnesses who may be called to testify before the houses of congress, pension examiners, or what not, and has left the narrower immunity as it stands in sections 859 and 860 of the Revised Statutes.

When this amendment to the interstate commerce act appeared, it was, like the original act, resisted; and in the case of U. S. v. James, 60 Fed. 257, it was held to be unconstitutional in toto, the fifth amendment being held to have a broader scope than the protection of the citizen against mere criminal prosecutions. In the case of Brown v. Walker, 70 Fed. 46, the contrary was held, upon the ground that the immunity was as broad as the constitution, and this view was affirmed by the supreme court of the United States in the case already cited, though there were four of the nine judges dissenting, and taking the view of Judge Grosscup in the James Case. This formidable array of dissenting judges might pronounce all these immunity statutes unconstitutional in their entirety, but the result of the decisions of a majority of the judges establishes that, if the immunity offered to the witness is as broad as the constitutional provision, he may be compelled to answer, and, of course, if he may be compelled to answer, he can be indicted for perjury if he swears falsely. But Counselman's Case settles it that the immunity offered under section 860 of the Revised Statutes is not as broad as the constitutional protection, and therefore the witness is not compelled to answer, and may, as before remarked, exercise the privilege, under the constitution, of standing absolutely mute, which was the right that this defendant had as to every question propounded to him by Examiner Ragsdale. I do not find that it has been determined by any court whether the proviso to Rev. St. § 860, that the immunity shall not operate to protect the witness against prosecutions for perjury committed in the examination itself, is consistent with the constitutional guaranty. The same proviso is to be found in the act of February 11, 1893, amending the interstate commerce act, and none of the decisions under that act have considered that point, unless it may be covered by that which has already been quoted from the opinion in the case of Brown v. Walker, supra. Broadly, that question is presented by this case; but inasmuch as the examination which was taken here is held to have been taken under a compulsion, coupled with the absence of the needed warn-

ing to the witness, that makes it inadmissible, the point need not be decided, and perhaps should not be until it is devested of complication with other questions. It is too important a provision for the protection of such examinations to be decided until the courts are compelled to do so. Courts do not annul statutes for unconstitutionality except in the last resort.

There is another consideration relating to this statute which strengthens the ruling we have made, and, if it stood alone, it would be sufficient to condemn the use of this examination as evidence against the defendant on such a charge as this. The special examiners of the pension bureau exercise their authority under the provisions of Rev. St. § 4744, as amended by the act of July 25, 1882 (22 Stat. 174; 1 Supp. Rev. St. p. 360). It reads as follows:

"Sec. 2. The commissioner of pensions is authorized to detail from time to time clerks or persons employed in his office to make special examination into the merits of such pension or bounty land claims, whether pending or adjudicated, as he may deem proper, and to aid in the prosecution of any party appearing on such examinations to be guilty of fraud either in the presentation or in procuring the allowance of such claims, and any person so detailed shall have the power to administer oaths and take affidavits and depositions in the course of such examinations, to orally examine witnesses and to employ a stenographer when deemed necessary by the commissioner of pensions in important cases, such stenographer to be paid by such clerk or person and the amount so paid to be allowed in his accounts.

"Sec. 3. That in addition to the authority conferred by section 184 of the Revised Statutes any judge or clerk of any court of the United States, in any state, district or territory, shall have power, upon the application of the commissioner of pensions, to issue a subpœna for a witness being within the jurisdiction of such court, to appear at a time and place in the subpœna stated, before any officer authorized to take depositions to be used in the courts of the United States, or before any officer, clerk or person from the pension bureau designated or detailed to investigate or examine into the merits of any pension claim, and authorized by law to administer oaths and take affidavits in such investigation or examination, there to give full and true answers to such written interrogatories and cross-interrogatories as may be propounded to him, or to be orally examined and cross-examined upon the subject of such claims; and witnesses subpœnaed pursuant to this and the preceding section shall be allowed the same compensation as is allowed witnesses in the courts of the United States, and paid in the same manner."

Section 184 of the Revised Statutes, referred to in this amendment, enacts as follows:

"Any head of a department or bureau in which a claim against the United States is properly pending, may apply to any judge or clerk of any court of the United States in any state, district or territory, to issue a subpœna for a witness being within the jurisdiction of such court, to appear at a time and place in the subpœna stated, before any officer authorized to take depositions to be used in the courts of the United States there to give full and true answers to such written interrogatories and cross-interrogatories as may be submitted with the application or to be orally examined and cross-examined upon the subject of such claims."

Rev. St. § 186, enacts:

"If any witness after being duly served with such subpœna neglects or refuses to appear, or appearing refuses to testify the judge of the district in which the subpœna issued may proceed upon proper process to enforce obedience to the subpœna or to punish the disobedience in like manner as any court of the United States may do in the case of process of subpœna ad testificandum issued by such court."

In the case of In re McLean, 37 Fed. 648, Mr. District Judge Benedict, upon an application made by a commissioner of pensions for a subpœna under these acts, refused the subpœna, upon the ground that congress did not have the power to invoke the aid of the courts in a purely executive examination pending in an executive department of the government. For this, he stated as authority the judgment of Mr. Justice Field in Re Pacific Railway Commission, 32 Fed. 241, in which substantially the same ruling was made. Subsequently, the same ruling was made by Mr. Circuit Judge Gresham in Re Interstate Commerce Commission, 53 Fed. 476.

It is contended by the district attorney that these decisions have been overruled by the case of Interstate Commerce Commission v. Brimson, 154 U. S. 447, 14 Sup. Ct. 1125. Possibly, in some respects, these decisions are inconsistent with each other, and it may be said that the power of congress to authorize an administrative commission to invoke the aid of the courts in compelling the production of witnesses and documentary evidence before the commission for the purposes of their examinations, and the punishment of such witnesses for false swearing and perjury, has been established by the Brimson Case; but the difference between the procedure authorized by congress for the aid of the interstate commerce commission and that in aid of these examinations by the pension bureau, as provided for in the last-quoted statute, is very wide, and the underlying power is much more carefully directed in the one than in the other, for the very purpose of protecting the rights of witnesses under the fifth amendment to the constitution of the United States.

The twelfth section of the original interstate commerce act authorized the circuit courts of the United States, in case of contumacy or refusal to obey a subpœna issued by the commission, to issue its order requiring the witness or party to give evidence touching the matter in question, and to punish by contempt a refusal to obey its order, and it especially forbade that the witness should refuse to testify because the evidence would tend to incriminate him, and enacted broadly that the testimony should not be used against the prisoner on the trial in any criminal proceeding. 24 Stat. 379; 1 Supp. Rev. St. p. 529. Amended by the act of February 10, 1891 (26 Stat. 743; 1 Supp. Rev. St. p. 891), this twelfth section now provides that the commission, in case of the disobedience to a subpœna of the commission, may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses, and the production of books and papers, and, further, that:

"Any circuit court of the United States within the jurisdiction of which such inquiry is carried on may in case of contumacy or refusal to obey a subpœna issued to any common carrier subject to the provisions of this act, or other person, issue an order requiring such common carrier or other person to appear before the said commission and produce books and papers if so ordered, and give evidence touching the matter in question, and any failure to obey such order of the court may be punished by such court as a contempt thereof. The claim that any such testimony or evidence may tend to incriminate the person giving such evidence, shall not excuse any such witness from testifying, but such evidence or testimony shall not be used against such person on the trial of any criminal proceeding."

This was the condition of the legislation at the time the Brimson Case occurred; and, as has been before stated, subsequent to that time, by the act of February 11, 1893, the constitutional objections to the inadequacy of the immunity offered have been removed so far as examinations before the interstate commerce commission are concerned, but, as before stated, have not been removed so far as they relate to examinations under the pension laws. Mr. Justice Harlan, in the opinion in the Brimson Case, considers the constitutional objections that were made in the cases just cited to these statutes, invoking the aid of the courts for the production of testimony, and sustains the procedure directed by the interstate commerce acts just referred to, upon the distinct ground that the commission was required, as the supreme court interprets the acts, by a petition to the circuit court, to distinctly set forth the particular questions to be answered, and the certain books and papers mentioned and named, and that it was then open to each witness to contend before that court that he was protected by the constitution from making answer to the questions propounded to him, or that he was not legally bound to produce the books, papers, etc., ordered to be produced, or that neither the questions propounded, nor the books, papers, etc., called for, related to the particular matter under investigation, nor to any matter which the commission is entitled under the constitution or laws to investigate; and, these issues being determined in favor of the witness by the court, the petition of the commission could have been dismissed upon its merits. Interstate Commerce Commission v. Brimson, 154 U. S. 479, 14 Sup. Ct. 1125.

Again, in another place, he says:

"The inquiry whether a witness before the commission is bound to answer a particular question propounded to him, or to produce books, papers, etc., in his possession, and called for by that body, is one that cannot be committed to a subordinate administrative or executive tribunal for final determination. Such a body could not, under our system of government, and consistent with due process of law, be invested with authority to compel obedience to its orders by a judgment of fine or imprisonment." 154 U. S. 485, 14 Sup. Ct. 1136.

The objection that the duties imposed upon the courts were nonjudicial was also disallowed, and the case was remanded for a determination by the circuit court of the question whether or not the witness was compelled to answer the particular questions which the petition of the interstate commerce commission asked that he should be compelled to answer. Again four of the judges dissented, and held the procedure unconstitutional. Interstate Commerce Commission v. Brimson, 155 U. S. 3, 15 Sup. Ct. 19.

Now, it is apparent from this statement of the procedure sustained in the Brimson Case, in aid of the interstate commerce commission, that it was justified in its relation to the fifth amendment to the constitution solely upon the ground that the witness must have an opportunity to invoke the judicial determination by a court of competent jurisdiction of the question whether he is compelled or not to answer the particular interrogatories propounded to him. In a case of contumacy and refusal of a witness before a pension examiner to answer a particular question propounded to him, and of his assertion of his right to protection under the constitutional

amendment, it is possible that "the judge of the district" in which the subpœna issued, under Rev. St. § 186, before exercising the power to punish the disobedience in like manner as any court of the United States may do in the case of process of subpœna ad testificandum issued by such court, would inquire whether the particular inquiries propounded were within the protection of the fifth amendment; but the section evidently does not contemplate that he is acting in any such judicial capacity as that. The provisions of the Revised Statutes are intended only for the purpose of furnishing the pension examiner with a subpœna, and to compel obedience to it. The interstate commerce commission issues its own subpœna, and applies to the court in case of contumacy; but this provision of the Revised Statutes (section 4744) does not confer any jurisdiction for protecting the rights of witnesses under the fifth amendment, nor does the amended provision of the act of July 25, 1882 (1 Supp. Rev. St. p. 360), make any such provision for the determination of the question of the right of the witness to stand silent as that provided in the amended interstate commerce act. Like Rev. St. §§ 184, 186, this amended act confers the power that was there conferred upon "the judge of the district" upon any judge of any court of the United States to issue the subpœna; and the amendment is strictly confined to the simple function of issuing the subpœna, and the power to punish for contempt for its disobedience is not given under the amended act, as it is under section 186 of the Revised Statutes. The truth is, these provisions for aiding the pension examiner are almost purely administrative, and, so far as issuing the subpœna is concerned, may, by the words of the act, as well be performed by the clerk of the court as by the judge, but the power to punish for contempt is confined to "the judge of the district"; and we find in the legislation no such provision as that contained in the interstate commerce act, as amended, conferring upon the circuit courts of the United States or any other courts of the United States the jurisdiction relied upon by Mr. Justice Harlan in the Brimson Case, to support the constitutionality of that act.

The result of all this is that this examination provided for the pension examiners is almost purely and entirely inquisitorial, and no safeguards are thrown around the witness for his protection, such as the litigation with the interstate commerce commission upon this subject has forced congress to throw around the witnesses appearing before that body; and, until congress does for the other tribunals appointed to make these administrative examinations what it has done for the interstate commerce commission in this regard, the courts cannot be expected to neglect the duty which Mr. Justice Bradley says, in the Boyd Case, supra, belongs to them, of watching against any stealthy encroachment upon the constitutional rights of the citizen. And the least that they can require of these examiners, so armed with such dangerous power, and invested with such tempting opportunities to invade the constitutional guaranty, is that they shall conduct their examinations in such a manner that the citizen shall be fully warned of his constitutional right, and offered an opportunity to assert it by a refusal to answer; and where the witness

81 F.—54

is ignorant and helpless, and such warning is neglected, protection can be afforded to him by the courts in no other way than by refusing to give any effect to the examination by way of any criminal prosecution to support it and its objects. If one asserts his privilege, and refuses to answer, then will arise the important question whether, under existing legislation above noted, there be any jurisdiction anywhere to compel him or to protect him by limiting the examination within constitutional bounds. Until congress shall set about improving the system of inquisition, it is not to be expected that the courts shall aid its usefulness at the expense of the constitutional protection of every citizen.

I have no doubt from the proof in this case that the defendant was guilty of making a false certificate, nor that he was guilty afterwards of falsely standing by his false certificate, by the oath that he took before this examiner; and although, in this particular case, the United States lost no money, and the pensioner lost no money, and no particular harm was done in that regard, I should say for myself that it was a fraudulent proceeding against the United States, by false certificates, to deny to the pension bureau that security which is provided for by requiring a magisterial officer to identify the pensioner at the time of the payment, and otherwise protecting the pension funds against a fraudulent misuse of them; but, having been formerly acquitted by a jury of the offense of making a false certificate, it does not now lie with us to hold the defendant responsible for any offense he committed in that respect, and he now and here stands not only under the ordinary presumption of innocence, but under the sanction of that acquittal, as having committed no such offense. And yet it is sought by this prosecution for perjury substantially to punish him for the same thing, because he subsequently to the making of the false certificate, before the examiner, in one of these inquisitorial examinations, in ignorance of his right to protect himself by silence, has yielded to the temptation to sustain his certificate by swearing that it was true. Heinous as the crime of false swearing is under our law, it is entitled to no other relaxation of the constitutional guaranty of the citizen in order to punish it than any other offense.

It must be conceded to the district attorney that it has been repeatedly and quite uniformly decided everywhere, under many varying conditions of fact, that where one who is incompetent as a witness, or for any reason is not subject to examination, is nevertheless compelled to testify, or does in fact testify, he must tell the truth, and perjury may be prosecuted against him if he does not. Here, in Tennessee, a witness not competent to swear for himself, under the book-debt law, erroneously was allowed to testify, and, being accused of false swearing by his adversary, brought an action of slander, and the defense that it was not a legal oath was overruled. Sharp v. Wilhite, 2 Humph. 434; Haley v. McPherson, 3 Humph. 104. And an extreme case in Pennsylvania serves as an illustration where a party to a suit offered to leave the decision of the justice to the oath of his adversary, who was wholly incompetent to testify except by this kind of consent; yet having accepted the offer, and been

sworn, it was perjury or false swearing to testify falsely. Shaffer v. Kintzer, 1 Binn. 542, and authorities there cited. And where a husband was especially incompetent to testify as to a particular fact in divorce proceedings, nevertheless, if he did testify falsely, it would be perjury. Chamberlain v. People, 23 N. Y. 85; Van Steenbergh v. Kortz, 10 Johns. 166. Where a witness before the grand jury, whether under subpœna or not, did answer questions protected by his privilege to stand silent, he was indictable for perjury, because it did not appear that he was answering under any compulsion, and presumably he had waived his right; but, if compulsion had appeared, the indictment would not have been good. Pipes v. State (Tex. App.) 9 S. W. 615. And see State v. Molier, 1 Dev. 263; Patrick v. Smoke, 3 Strob. 147; Montgomery v. State, 10 Ohio, 221; 2 Bish. Cr. Proc. § 1017; 1 Bish. Cr. Proc. §§ 865, 872; 1 Whart. Cr. Law, §§ 489, 493. And it is a personal privilege which the witness may waive, and presumably does waive if he does not set it up, and, after waiver, may be compelled to go on and answer. Brown v. Walker, 161 U. S. 591, 597, 16 Sup. Ct. 644; 29 Am. & Eng. Enc. Law, pp. 844, 845; Mackin v. People, 115 Ill. 312, 3 N. E. 222; Mattingly v. State, 8 Tex. App. 345; State v. Maxwell, 28 La. Ann. 361; State v. Hawkins, 115 N. C. 712, 20 S. E. 623; Murphy v. State (Tex. Cr. App.) 26 S. W. 395. But this principle and these cases are all answered by the peculiar circumstances in this case, which we find conclusive of the fact that this untutored, uninformed, unwarned, and unconscious negro did not waive his privilege and constitutional right, and was answering under a compulsion as potential for him as if he had been under physical, as he was under mental, duress.

In the case of U. S. v. Farrington, 5 Fed. 343, Judge Wallace quashed the indictment of a grand jury where it appeared that the attorney employed by the banks to prosecute the defendants was permitted to become a witness before that constitutionally inquisitorial tribunal, and urge their indictment upon the testimony of the defendant Leake, who was examined compulsorily before a commissioner as a witness against the defendant Farrington, his co-offender; and this, too, although the district attorney advised the grand jury that the minutes of the commissioner were not competent testimony against Leake himself. The court disapproved of the contrary ruling in the case of U. S. v. Brown, 1 Sawy. 531, Fed. Cas. No. 14,671. And in State v. Froiseth, 16 Minn. 296, the same thing was done, for the same reason, because it was a violation of the bill of rights that one should not be compelled to criminate himself. And it is worthy of remark here that these pension examiners, in making their examinations, are, by the very language of the act of congress, constituted prosecutors "to aid in the prosecution of any party appearing on such examinations to be guilty of fraud" (Rev. St. § 4744; as amended, 1 Supp. Rev. St. p. 360), from which we have it as a part of the system that these obnoxious inquisitorial examinations are taken before and by an officer charged with the duty of inaugurating the prosecutions. The hapless witness is examined for information by his adversary, so to speak,—him whose duty it is to unearth his

offenses, and institute a prosecution. Can the fact that the particular disclosures cannot be used as confessions or admissions when the prosecution is instituted lessen the objectionable features so far as they affect injuriously the right to be silent, if the witness choose, is concerned? And does not this peculiarity of the statute impose more imperatively the duty of the examiner to give warning of the danger to the witness, and advise him of his constitutional right, before proceeding? This may lessen the chance to procure evidence, and impair the efficiency of the system as a protection against fraud to the vast appropriations for pensions; but what of that, if it destroy the protection of the constitution for the witness against any invasion of his right to be absolutely silent, which he had in this case? Many writers have admired the efficiency of the French or continental system of espionage and inquisition to suppress crime, but England and America have not wished to adopt it, however tempting and useful it may be.

In U. S. v. Grottkau, 30 Fed. 672, an alien made a naturalization affidavit as to his residence, which the naturalization laws forbade as evidence, and it was held that perjury could not be assigned on it, because extrajudicial. The statutes we have under consideration forbid these examinations to be used as evidence in any judicial proceeding against the witness; and, although the same statutes say that this prohibition shall not extend to prosecutions for perjury, the question remains whether the abrogation of their quality as evidence has not impressed them with the valuelessness of extrajudicial oaths, under the law of perjury. They may be useful sources of information for the pension bureau, and yet not available for criminal prosecutions, though it must be confessed that, if they are not protected by the sanction against false swearing, the information might not be very valuable for any purpose. But this may be one of the inconveniences of our fifth amendment to the constitution, protecting criminals against self-incrimination by their testimony. The statute authorizing these examinations by the pension examiners has been commended by Judge Hughes in the case of U. S. v. James (Va., A. D. 1894), which is not found reported, but is noted in Pierson's Compilation of Precedents for the Pension Bureau, Washington, 1895, p. 57. That learned judge remarks that he "is not prepared to say that the law is unconstitutional or even impolitic. It seems to me a law of necessity, arising out of the peculiar character of the offenses." Pierson's Precedents, 57. And I find in the case of Com. v. Turner (Ky.) 33 S. W. 88, almost a direct precedent in favor of the constitutionality of this statute. A prosecution was pending against one Harned about a fight between him and Turner. The latter was compelled to answer certain questions by the order of the court against his will and protest, claiming his privilege under the constitution. He was indicted for false swearing in his answers. The trial court charged the jury that, if they found he swore under compulsion, they should acquit; but this instruction was reversed on appeal by the commonwealth under a peculiar practice in Kentucky in that behalf, the court of appeals holding that the decision of the trial court in the original Harned Case, that the questions and

answers were not under the constitutional protection, was conclusive of that question, and could not be reviewed by another trial court in a subsequent trial for perjury by a witness in the original case. It had been already judicially settled that the witness was not protected, and therefore his oath was not against the constitutional privilege, although under compulsion. But the court went further, and broadly decided that, if it had been, nevertheless perjury would lie for the false swearing, because it is the policy of our laws to punish under all circumstances the heinous offense of false swearing; and if one with a privilege to stand mute is still compelled, against his right, to speak, he must speak the truth, notwithstanding the violation of his constitutional guaranty. His only remedy is to stand by his right, refuse to answer, and take the consequences of his disobedience. The court says that it finds no precedent for this judgment, and no case deciding the point. There is great force in this view, undoubtedly, and particularly when it is considered how valuable and necessary it is to protect the operations of a government against fraud by inquisition under oath. What is said by the learned judge is probably obiter, as the decision had already been made that the witness was not within the shelter of the constitution, but stood outside of it, subject to compulsion to testify. In this case, the defendant, Bell, was within the constitutional protection, and was compelled notwithstanding. In my judgment, he cannot have the protection of the constitution, and be compelled to testify in spite of it; and his right to protection is paramount to any public policy or necessity for punishing false swearing, and, like all other desirable ends in government and all other public policies, this must yield to a constitutional guaranty which protects the citizen against invasion of his privileges. The public policy of protecting him is as much cherished by English and American sentiment as is that which insists on the purity of oaths. We must get along as best we can without breaking down the constitutional privilege, no matter what inconvenience or loss may result, or else change the constitution. It is precisely this kind of constitutional restriction which is tolerable as against governmental supremacy. Finally, it seems quite plain that additional legislation is needed by congress to conform this system of administrative examinations in aid of the pension and other executive bureaus to the guaranty of the fifth amendment that no person shall be compelled to give evidence against himself in any criminal case, as has been done by the legislation in aid of the interstate commerce commission, as a result of the resistance in practice to the exercise of their unconstitutional demands for the testimony of witnesses who might incriminate themselves.

All that we now decide to be necessary to afford the protection of the constitution to this defendant is that unless a witness manifestly ignorant of his privilege is informed of it by the examiner, so that he may protect himself, consult counsel if he desires, and assert his right to remain silent, the examination cannot be used in evidence against him, even on an indictment for false swearing in the progress of the examination itself. The examiner must do what the courts generally, if not always, do, in examining a witness in danger of in-

criminating himself,—warn him of the danger, and advise him of his constitutional privilege. That was not done in this case, and the defendant must be acquitted and discharged. .